No. 03-552

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 231

TRAVIS CAMPBELL,

        Petitioner and Appellant,

    v.

GARDEN CITY PLUMBING AND HEATING, INC.,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Fourth Judicial District,
                     In and for the County of Missoula, Cause No. DV-02-950,
                     The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Robert Terrazas, Justin Starin, Robert Terrazas, P.C., Missoula, Montana

        For Respondent:

                Joe Seifert, Keller, Reynolds, Drake, Johnson & Gillespie, P.C., Helena, Montana

                            Submitted on Briefs:  January 6, 2004

                                    Decided:  August 24,  2004

Filed:

_____
                                Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Travis Campbell filed a petition in the District Court, Fourth Judicial District, Missoula County, for judicial review of a decision of the Montana Human Rights Commission dismissing Campbell's sex discrimination complaint.

¶2 The issue appealed is whether the Department of Labor's hearing officer, the Human Rights Commission, and the District Court erred in concluding that Campbell's co-workers and supervisors did not discriminate against him because of his sex.

¶3 The District Court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Travis Campbell (Campbell) filed a Charge of Discrimination with the Montana Department of Labor and Industry, in which he alleged that his former employer, Garden City Plumbing and Heating, Inc. (Garden City), illegally discriminated against him because of his sex. A contested hearing was held before a hearing examiner and the Department issued a Final Agency Decision which dismissed Campbell's charge. Campbell appealed the decision to the Montana Human Rights Commission, which affirmed the hearing officer's decision. Campbell then filed a Petition for Judicial Review, Complaint, and Demand for Jury Trial in the District Court. The District Court affirmed the Human Rights Commission's decision.

¶5 In February 1999, Campbell began working for Garden City as a parts runner. As a parts runner, he worked out of the shop/administration building. While working in the shop, Campbell was periodically subjected to vulgar comments made in passing by other Garden City employees. This profane manner of communication was common amongst Garden City

2

field employees.

¶6     In July 2000, Campbell was promoted to laborer on a plumbing crew and was hoping to be further promoted to apprentice. Though other crew members sometimes received similar treatment, as the newest member of the crew Campbell was barraged with offensive, sex-themed comments. These comments nearly always referred to various ways the other crew members wanted to use Campbell to sexually gratify themselves. These instances were, to say the least, graphic and crude. The instigators of the vulgarity sometimes included two of Campbell's supervisors.

¶7     Campbell tried various approaches to dealing with the uncomfortable treatment he was receiving, but to no avail. He would curse at the others. Sometimes he would join in the banter. Sometimes he would tell stories of his own sexual exploits in an effort to deflect the taunting elsewhere. After enduring this treatment for some time, Campbell approached one of his supervisors and asked whether a man could turn in another man for sexual harassment. He was told that he could turn someone in, but that he would probably not live to testify. The supervisor dismissed the conversation as a joke and never followed up with Campbell. Campbell never brought the topic up again with anyone in the company.

¶8     Within a few months, Campbell had become so upset that he began calling in sick. Toward the end of October 2000, Campbell told the company project manager that his grandmother was ill and that he needed to attend to her. He asked to be laid off so he could collect unemployment. The request was refused and Campbell never returned to work. In early November 2000, Campbell called the project manager, apologized for lying about his grandmother, and explained that he had quit work because of the harassment. Campbell was

3

informed that he could be reassigned to a different crew, but he declined because he did not want to have to face any of the other crew members again. Campbell was then invited to come to the office and discuss the matter further, and was told that he had been doing good work. Campbell never went to the office.

¶9 There is no dispute that the coarse, sexually-explicit taunting actually occurred. The hearing officer found that "[c]oarse, vulgar, sexually-themed language was prevalent among all of the members of the plumbing crew . . . . As the newest member of the crew, Campbell was a major target of such comments . . . . Campbell was intimidated by the ceaseless stream of gratuitous sexual comments . . . . [T]he number of them and the degree of vulgarity and violence embodied within them began to wear on him. He began to fear that some of his coworkers, all of whom were considerably larger and stronger than he was, might actually mean some of the comments."

## STANDARD OF REVIEW

¶10 "The standard of review for final decisions of the Human Rights Commission is whether its findings of fact are clearly erroneous and whether the agency's interpretations of the law are correct." *Great Falls Public Schools v. Johnson*, 2001 MT 95, ¶ 14, 305 Mont. 200, ¶ 14, 26 P.3d 734, ¶ 14. "We employ the same standard when reviewing a district court order which affirms or reverses an administrative decision." *Vortex Fishing Systems, Inc. v. Foss*, 2001 MT 312, ¶ 12, 308 Mont. 8, ¶ 12, 38 P.3d 836, ¶ 12.

## DISCUSSION

¶11 We note that we have not previously reviewed a case of same-sex sexual harassment. However, the U.S. Supreme Court has conclusively determined that claims of same-sex

4

sexual harassment fall squarely within the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Title VII), the rationale being that Title VII prohibits discrimination because of sex in the terms or conditions of employment, and any sexual harassment that meets the statutory requirements is included. *Oncale v. Sundowner Offshore Services, Inc.* (1998), 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201. As our statutory language mirrors Title VII, we adopt the holding of *Oncale* for Montana.

¶12 Reference to federal case law is appropriate in employment discrimination cases filed under the Montana Human Rights Act (MHRA), Title 49, MCA, because the provisions of Title 49 parallel the provisions of Title VII. *Johnson v. Bozeman School District No.7* (1987), 226 Mont. 134, 139, 734 P.2d 209, 212.

¶13 Section 49-2-303(1)(a), MCA, of the Human Rights Act, prohibits discrimination in employment practices based on a person's sex when the demands of the position do not warrant a sex distinction. Section 24.9.604(1), ARM, provides that:

> it is unlawful for an employer . . . to discriminate against a person in the terms, conditions or privileges of employment because of a person's membership in a protected class.

According to § 24.9.602(1), ARM, to be a member of a protected class one must:

> belong[] to a group of persons who are afforded protection against discrimination because of . . . sex . . . as set forth in the act or code.

Section 24.9.604(3), ARM, sets forth examples of practices which may constitute discrimination including:

> (b) subjecting a person to harassment in the workplace because of the person's membership in a protected class . . .
> (d) segregating or classifying a person in a way that adversely affects employment status or opportunities because of membership in a protected class . . . .

5

¶14    Likewise, Title VII provides that it is:

> an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such person's . . . sex.

42 U.S.C. § 2000e-2(a).

Finally, via § 24.9.1407, ARM, Montana has specifically adopted the definition of actionable sexual harassment as set forth in 29 CFR § 1604.11:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

*See also Harrison v. Chance* (1990), 244 Mont. 215, 221, 797 P.2d 200, 203.

¶15    "[T]here are two forms of sexual harassment that violate [the] prohibition against workplace discrimination: (1) quid pro quo; and (2) hostile work environment harassment." *Beaver v. Montana Dept. of Natural Resources and Conservation*, 2003 MT 287, ¶ 29, 318 Mont. 35, ¶ 29, 78 P.3d 857, ¶ 29.  This case deals with an alleged hostile environment situation.   Gleaning from the aforementioned statutes, we perceive that for a plaintiff to establish a prima facie case of hostile environment sexual harassment, four requirements must be met.

¶16    First, the plaintiff must be a member of a protected class.  In a sexual harassment scenario, only two classes are possible, male and female.

¶17    Second, the plaintiff must show that the offensive conduct amounted to actual

discrimination because of sex, i.e. "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80, 118 S.Ct. at 1002, 140 L.Ed.2d at 207. It is required that a plaintiff "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex.'" *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1002, 140 L.Ed.2d at 208. With respect to proving actual discrimination, the Court left the door open for plaintiffs to take whatever evidentiary route thought best, but made clear that a plaintiff must prove that the motivation behind the discrimination was clearly based on the plaintiff's sex. *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1002, 140 L.Ed.2d at 208.

¶18     Third, the plaintiff must show that the harassment was unwelcome. Section 24.9.1407, ARM; 29 C.F.R. § 1604.11.

¶19     Fourth, the plaintiff must show that the claimed sexual harassment was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment. *Beaver*, ¶ 30. To be sufficiently severe, the working environment must be one that a reasonable person would find hostile and abusive, and one that the plaintiff in fact perceived as hostile and abusive. *Beaver*, ¶ 31. To determine whether the environment is hostile and abusive, the courts are to look at all the circumstances, "including the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Beaver*, ¶ 31. A district court may also consider who perpetrated the harassment, whether the employer had notice of the conduct, and what, if

7

any, remedial measures were taken by the employer. *Beaver*, ¶ 38, ¶ 49.

¶20    In this case, Campbell obviously satisfies elements one and three in that Campbell falls into the protected class of "males," and he clearly demonstrated that his co-workers' lewdness was unwelcome. The unwelcomeness of the treatment is shown in that Campbell frequently reacted by cursing at the men and leaving the scene, and the hearing examiner found that Campbell was intimidated by the treatment he received, feared his co-workers, became depressed, and was humiliated.

¶21    With respect to element two, Campbell argues that neither proof of sexual desire nor proof of sexual stereotyping is required to establish discrimination based on sex. Campbell is correct in this aspect of his analysis, but his analysis is not complete. What is missing in this particular instance is necessary proof of some discriminatory motive. *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1002, 140 L.Ed.2d at 208. Campbell seizes on the language in *Oncale* that states that a plaintiff may utilize "whatever evidentiary route" he chooses to prove discrimination. He then goes on to argue that the Garden City employees intimidated, ridiculed, and insulted him to the point of altering his conditions of employment. This argument, however, does not address the motive requirement. It only addresses the fourth element of a prima facie case.

¶22    Both the hearing examiner and the District Court found that Campbell had failed to prove that the disturbing treatment Campbell endured was perpetrated upon him because he is a male. The hearing examiner found that "Campbell failed to prove that his harassers either were hostile toward men generally or acting out sexual desires toward him." The hearing examiner also found that Campbell's speculation that his small stature contributed

8

to the treatment was not supported by any evidence. The District Court agreed that Campbell's mere assertions that his small stature, his habit of wearing an earring, and his habit of extending his pinkie finger when drinking from a coffee cup were not sufficient evidence to prove gender-stereotyping when none of the statements made by his harassers supported these allegations. The District Court also found that the hearing examiner had considered other possible motives for the conduct and properly concluded that while Campbell had endured "wretched treatment," he had not presented proof of the required motive.

¶23    Campbell argues that his co-workers' conduct did discriminate against him, as a man, because the comments directed at him were of the sort that would be especially degrading to a heterosexual man. In other words, his co-workers would not have said the things they said if Campbell were not a man. While this may or may not be true, this sort of workplace policing is exactly what the U.S. Supreme Court had in mind when it warned that Title VII was not to be denuded into a "general civility code." *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1002, 140 L.Ed.2d at 208. In *Oncale* itself, the facts were even more egregious than in Campbell's case, yet the Court was concerned that courts and juries not "mistake ordinary socializing in the workplace - such as male-on-male horseplay or intersexual flirtation - for discriminatory 'conditions of employment.'" *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1003, 140 L.Ed.2d at 208. The Court cautioned that "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position . . . would find severely hostile or abusive." *Oncale*, 523 U.S. at 82,

9

118 S.Ct. at 1003, 140 L.Ed.2d at 208-209. It cannot be gainsaid that the conduct perpetrated upon Campbell by his coworkers, and allowed by management, was infantile and decidedly pusillanimous. Yet, while it is unfortunate that Campbell was subjected to such puerile conduct, Campbell did not prove that the conduct rose to the level of discrimination based on sex.

¶24 Finally, Campbell attempts to argue that his co-workers' and supervisors' conduct was motivated by a desire to intimidate, threaten, and offend him. He argues that because the ridicule and insults were so pervasive, the conditions of his employment were altered and did create a hostile work environment. Again, Campbell confuses element two with element four. Campbell is essentially claiming that proof of an intimidating work environment constitutes proof of discrimination because of sex. The District Court was aware of this deficiency with respect to Campbell's analysis of elements two and four and correctly concluded that,

> there is substantial credible evidence in the record to support a finding that the Garden City employees' conduct was so severe and/or pervasive that it altered the work environment for Travis Campbell and, in fact, discouraged him from remaining on the job. However, as stated supra, there is a lack of substantial credible evidence in the record that the harassment occurred because of Travis Campbell's sex.

¶25 Campbell was unable to prove that he was discriminated against because of his sex. Therefore, the District Court did not undertake a complete review of element four. Because we agree that element two was not proved, we also decline further analysis of element four.

¶26 The District Court is affirmed.

/S/ JOHN WARNER

10

We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ JIM RICE

Justice W. William Leaphart dissenting.

¶27    I dissent.

¶28    As the Court notes, a claimant must satisfy four elements in order to establish a prima facie case of hostile environment sexual harassment:  (1) the plaintiff must be a member of a protected class (male or female); (2) the plaintiff must show that the offensive conduct amounted to actual discrimination because of sex and that the motivation behind the discrimination was clearly based on the plaintiff's sex; (3) the plaintiff must show that the harassment was unwelcome; and (4) the plaintiff must show that the claimed sexual harassment was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment.

¶29    The Court determines that Campbell's claim must fail because he failed to establish element number two–discriminatory motive. This Court affirms the District Court which in turn affirmed the hearing examiner's finding that Campbell  failed to prove that his harassers were hostile towards men in general or were acting out sexual desires toward him.  Campbell correctly points out that he should not have been required to prove sexual desire in the first place. *Oncale,* 523 U.S. at 80, 118 S.Ct. at 1002, 140 L.Ed.2d at 208.  Although sexual desire is not a required element of a sexual harassment case, proof of sexual desire is one way that a claimant can prove his employer discriminated against him based on sex. *Oncale*, 523 U.S. at 80-81, 118 S.Ct. at 1002, 140 L.Ed.2d at 208 (plaintiff may prove discrimination by "[w]hatever evidentiary route the plaintiff chooses to follow").  Here, Campbell proved that his harassers were motivated by self-declared sexual desire and sexual stereotyping.

12

¶30    The Court acknowledges that the co-workers may not have made the vulgar comments to Campbell if he were not a man.  Nonetheless, the Court feels it should not stretch the law of sexual harassment so far that it becomes merely a code of "general civility."  Citing *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1003, 140 L.Ed.2d at 208, it cautions that we should not "mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'"

¶31    In the context of the present case, I seriously question whether this deferential, permissive approach is called for.  To illustrate my point, I refer to a few of the less sordid examples in the record:  Campbell's foreman, a 225-pound man, told Campbell that "he was going to have sex with his wife this morning but he thought he would wait until he got to work to have sex with me [Campbell] because he likes it better."  He repeatedly told Campbell that he was going to "butt fuck" him.  Campbell testified that there was one incident in which Campbell was standing in the ditch digging and his foreman came up, straddled the ditch and motioned toward his crotch saying Campbell was the "perfect height" for giving him pleasure. Given that there are numerous more graphic instances of sexually explicit harassment in the record, I am at a loss as to how the hearing examiner could conclude that this did not amount to "acting out sexual desires" towards Campbell.

¶32    Being of  the male persuasion,  I can safely say that there is no danger that such threats will be mistaken for "ordinary socializing in the workplace" nor as male-on-male "horseplay" or "same sex roughhousing."  If some 225-pound depraved male threatens a 120-pound male with nonconsensual anal intercourse, no further proof of "motive" is needed; the "motive" is apparent. The law does not require Campbell to hire a psychologist

13

to analyze his co-workers and supervisors to ascertain whether they desired sex with Campbell. When the record shows Campbell's co-workers and supervisor saying they wanted to have anal intercourse with Campbell, the Court can take them at their word. If statements like this do not suffice to prove discrimination based on sex, one wonders what quantum of proof is needed; must a plaintiff show actual physical contact amounting to criminal assault or sexual intercourse without consent? If so, that is hardly good public policy.

¶33 There is no question but that Campbell was subjected to this base and degrading conduct because he is male. A reasonable person would find this conduct severely hostile or abusive. To say that Campbell established a prima facie case of hostile environment sexual harassment would be a gross understatement.

¶34 I would reverse the decision of the District Court.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson joins in the dissent of Justice Leaphart.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter dissenting:

Except for the fact that I am of the female as opposed to the male persuasion (*see* ¶ 32), I concur in everything that is said in Justice Leaphart's dissent.

/S/ PATRICIA O. COTTER

14