No. 04-352

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 129

ANGELA STRINGER-ALTMAIER,

   Plaintiff and Appellant,

 v.

FRED HAFFNER, JANET HAFFNER,
d/b/a GOOD TIME CHARLIE'S RESTAURANT,
R & R CASINO, and CODY BILL'S STEAKHOUSE,

   Defendants and Respondents.

APPEAL FROM:  The District Court of the Eighth Judicial District,
       In and For the County of Cascade, Cause No. DDV 2003-069(a),
       Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Elizabeth A. Best, Best Law Offices, P.C., Great Falls, Montana

   For Respondents:

     Jean E. Faure, Jason T. Holden, Church, Harris, Johnson & Williams,
     P.C., Great Falls, Montana

        Submitted on Briefs: November 4, 2004

          Decided: June 13, 2006

Filed:

_____
       Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Angela Stringer-Altmaier (Angela) appeals an Order of the District Court for the Eighth Judicial District, Cascade County, affirming a decision of the Montana Human Rights Commission (the HRC) that Fred Haffner (Fred) and his mother, Janet Haffner-Lynn (Janet), did not discriminate against her. Angela appeals. We reverse and remand for further proceedings consistent with this Opinion.

¶2 We address the following issue on appeal: Whether the District Court erred in affirming the HRC's reversal of the Final Agency Decision.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On January 29, 2001, Angela filed three Complaints with the HRC. In her Complaints, Angela alleged that Fred and Janet, doing business as the R&R Lounge and Casino; Good Time Charlie's Restaurant; and Cody Bill's Steakhouse (collectively referred to hereinafter as "Respondents"), discriminated against Angela in her employment on the basis of sex when she was subjected to a sexually hostile and offensive work environment. Janet owned all three businesses and Fred managed some or all of the businesses for Janet. Angela alleged in her Complaints that Fred sexually harassed her and that when she objected to this hostile work environment, Janet forced her to quit.

¶4 Angela worked from 6:00 p.m. until 2:00 a.m. as a bartender for Respondents. She claimed that she specifically requested this evening shift when she was hired because she is a single mother and the daycare and kindergarten schedule for her daughter required continuity of care and transportation. Angela alleged in her Complaint that after she complained to

2

Janet about Fred's conduct, Janet changed the work schedule and switched Angela to day shifts. According to Angela, when she called Janet to protest the change in shifts and to inform Janet that she could not work those shifts because of her child, Janet told her that if she couldn't work the day shifts she would have to quit.

¶5 On July 30, 2001, after investigating Angela's Complaints, the HRC issued a finding of reasonable cause to believe that the Complaints had merit. The HRC consolidated the three cases and a contested case hearing was conducted by a Hearing Examiner on April 8-11, 2002. The Hearing Examiner issued a Final Agency Decision on July 19, 2002, wherein he found the following facts:

> 9. In 1990, ten years before [Angela] came to work for [Janet], three former employees of the business filed Human Rights Act complaints of sex discrimination, alleging that [Fred] had subjected them to harassment and hostile treatment because of their sex (female). After a 1991 consolidated contested case hearing on all three complaints, the hearing officer issued a proposed commission decision finding against two of the charging parties and in favor of the third. . . . The cases settled before the Commission acted upon the proposed decision. . . .
> . . . .
> 11. In the course of his work in the business, [Fred] frequently would visit with customers and employees in the bar. He often embarked upon sexual flirtations with women, sometimes touching them. He made suggestive comments about individuals' attire or bodies. He sometimes used sexually explicit words to describe individuals. He sometimes displayed sexually suggestive objects (such as thong underwear with the business' name on it) in the workplace.
> . . . .
> 13. In December of 2000, [Fred] told [Angela] she was required to wear an elf costume to work for Christmas. [Angela] resisted, because she thought the costume was unflattering and humiliating. [Fred] insisted that she not only wear it, but try it on for him. After continued resistance, she agreed to try on the costume, because he was one of her supervisors. Because she was already wary of [Fred], she agreed with a fellow employee, Rochelle Johnson

3

Spencer, that if Spencer did not see [Angela] within five minutes after [Angela] went downstairs with [Fred], [Spencer] should come looking for her. [Fred] took [Angela] downstairs, and gave her a costume to try on in the bathroom. While she was in the bathroom, he stayed outside the door asking her how it fit, and asking her to come out. Very uncomfortable, [Angela] finally emerged from the bathroom. At that point, [Fred] began touching and feeling the costume, getting down on his knees and stroking first the outside of [Angela's] legs in the costume (tightly fitting tights) and then the insides of [Angela's] legs. [Angela] was "frozen" and did not know what to do. At that point, Spencer came downstairs and [Fred] stopped touching [Angela] and got to his feet.

. . . .

20. [Janet] redid the work schedule and changed [Angela] to day shifts. [Janet] rationalized this change as necessary because [Angela's] family was too frequently in the bar and casino when [Angela] was working, because [Angela] was not performing acceptably, because [Angela's] family included "undesirables," because [Angela] herself had faced criminal charges and because [Angela] required more training. In fact, [Janet] changed [Angela's] shift as the first step in a plan to either force [Angela] to quit or to fire here because she had complained about [Fred]. [Janet] also changed the schedules for a number of other employees at the same time. Those changes did not transform her motives for changing [Angela's] schedule.

¶6 Based in part on these facts, the Hearing Examiner determined that Respondents illegally discriminated against Angela by subjecting her to sexual harassment in her employment in a continuing course of conduct. The Hearing Examiner awarded Angela $1050.83 for lost wages and prejudgment interest, as well as $7000.00 for emotional distress.

¶7 Respondents appealed the Hearing Examiner's decision to the Human Rights Commission contending that this case should have been pleaded as a retaliation case. Respondents did not dispute the Findings of Fact in the Final Agency Decision, instead, they contested the application of the law to those findings. On December 30, 2002, after listening

4

to argument and reviewing the record, the HRC issued its Order Reversing Final Agency Decision.

¶8 Angela petitioned for judicial review. On April 15, 2004, the District Court entered an Order affirming the HRC's determination. Angela then appealed to this Court.

## STANDARD OF REVIEW

¶9 This Court reviews a district court's conclusions of law to determine whether the district court's interpretation of the law is correct. *Connell v. State, Dept. of Social Services* (1997), 280 Mont. 491, 494, 930 P.2d 88, 90 (citing *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603).

## DISCUSSION

¶10 *Whether the District Court erred in affirming the HRC's reversal of the Final Agency Decision.*

¶11 In its Final Agency Decision, the Hearing Examiner concluded that Respondents unlawfully altered the terms of Angela's employment by making sexual harassment a condition of her employment. Angela contends on appeal that the HRC and the District Court erred by reversing the Hearing Examiner's decision after they improperly reweighed the facts. Angela argues that Montana law prohibits the HRC from rejecting or modifying the Hearing Examiner's findings of fact unless it states with particularity that those findings were not based on competent substantial evidence. Here, Angela claims that those findings were, indeed, based on competent substantial evidence.

¶12     Angela also argues that the HRC and the District Court erred in concluding that this case should have been, but was not, pleaded as a retaliation claim. Angela maintains that retaliation was pleaded, but the Hearing Examiner applied the law to the facts as he found them and concluded that the facts proved a discriminatory hostile work environment claim.

¶13     Respondents contend that Angela did not appeal the Hearing Examiner's finding and conclusion that Angela failed to timely plead a retaliation claim. Respondents maintain that because Angela argues for the first time on appeal that she properly pleaded a retaliation claim, she has waived her right to argue that the Hearing Examiner was incorrect.

¶14     Respondents also maintain that the Hearing Examiner found that Fred's conduct did not create a hostile work environment, rather, it was Janet's reaction to Angela's complaint that created the hostile work environment. Consequently, Respondents contend that because Janet's conduct was not driven by Angela's sex, it cannot be used to support a claim of a hostile work environment.

¶15     We do not address the issue of whether Angela failed to properly plead a retaliation claim as we find Angela's claim regarding a hostile work environment dispositive of this case.

¶16     Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Beaver v. DNRC*, 2003 MT 287, ¶ 29, 318 Mont. 35, ¶ 29, 78 P.3d 857, ¶ 29 (quoting 42 U.S.C. § 2000e-2(a)(1)).

6

¶17    Montana law also prohibits employment discrimination based on sex.  *See* § 49-2-303(1), MCA.  Because the Montana Human Rights Act was closely modeled after Title VII, we have determined that "reference to federal case law is both appropriate and helpful" in construing the Montana Human Rights Act.  *Harrison v. Chance* (1990), 244 Mont. 215, 221, 797 P.2d 200, 204 (citing *Johnson v. Bozeman School Dist. No. 7* (1987), 226 Mont. 134, 139, 734 P.2d 209, 212).

¶18    The United States Supreme Court has held that under Title VII, "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."  *Harrison*, 244 Mont. at 221, 797 P.2d at 204 (quoting *Meritor Savings Bank, FSB v. Vinson* (1986), 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49).  This Court similarly held in *Harrison* that sexual harassment is sexual discrimination under the Montana Human Rights Act.

> When sexual harassment is directed at an employee solely because of gender, the employee is faced with a working environment fundamentally different from that faced by an employee of the opposite gender.  That difference constitutes sexual discrimination in employment.

*Harrison*, 244 Mont. at 221, 797 P.2d at 204 (internal citations omitted).

¶19    There are two forms of sexual harassment that violate Title VII's prohibition against workplace discrimination:  (1) harassment that involves the conditioning of concrete employment benefits on sexual favors (*quid pro quo*); and (2) harassment that creates a hostile or offensive work environment.  *Meritor,* 477 U.S. at 62, 106 S.Ct. at 2403.

¶20     The United States Equal Employment Opportunity Commission (the EEOC) determined long ago that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2405.  In 1980, the EEOC promulgated the following guidelines in identifying sexual harassment:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions, affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

*Harrison*, 244 Mont. at 221, 797 P.2d at 203-04 (quoting 29 C.F.R. § 1604.11(a)).

¶21     Furthermore, in *Harris v. Forklift Systems, Inc.* (1993), 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295, the United States Supreme Court held that

> whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

¶22     In the case *sub judice*, Angela needed to satisfy all of the following elements to prove her claim of a hostile work environment:

1.  she was subjected to verbal or physical conduct of a sexual nature;
2.  the conduct was unwelcome; and

8

3.  her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

*Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404-05.  The Hearing Examiner found in Angela's favor and determined that

> [Fred] did subject [Angela] to verbal and physical conduct of a harassing nature and the conduct was unwelcome.  However, until [Angela] complained to [Janet], the conduct was borderline with regard to whether it was severe or pervasive enough to alter the conditions of [Angela's] employment and create a hostile work environment . . . .  *The circumstance that created the hostile environment was [Janet's] reaction to the complaint.*  [Emphasis added.]

¶23    In reversing the Hearing Examiner's decision, the HRC determined that retaliation or retaliatory conduct by Janet was not the type of conduct referred to in the three-prong test for hostile work environment and that while the Hearing Examiner's findings may support a conclusion that Janet's conduct was retaliatory, the findings do not support a conclusion that Janet's conduct was driven by Angela's sex.  Consequently, the HRC determined that Janet's conduct could not be used to support the elements in a claim for hostile work environment.

¶24    Respondents are correct in asserting that to be actionable under Title VII and the Montana Human Rights Act, sexual harassment must be because of gender.  *Oncale v. Sundowner Offshore Services* (1998), 523 U.S. 75, 79-80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201; *Harrison,* 244 Mont. at 221, 797 P.2d at 204.  The express language contained in Title VII and the MHRA only makes it unlawful employment practice for an employer to discriminate "because of . . . sex."  42 U.S.C. § 2000e-2(a)(1); § 49-2-303(1)(a), MCA.  Or,

9

as Respondents point out, there can be no sexual harassment where actions are taken regardless of "gender" or "sex."

¶25 However, Respondents are incorrect when they maintain that Angela must use only evidence of Fred's conduct toward her to prove her claim for a hostile work environment. Respondents, the HRC and the District Court take too narrow a view when they conclude that Janet's conduct could not have been premised upon sex. The fact is that Angela was subjected to a hostile work environment by virtue of her sex and Janet's refusal to confront that problem along with her statement that Angela should put up with it, is sufficient to impose liability on Janet as the employer. To hold otherwise simply ignores the vicarious liability that Janet must suffer for failure to remedy the problem.

¶26 In *Faragher v. City of Boca Raton* (1998), 524 U.S. 775, 807, 118 S.Ct. 2275, 2292, 141 L.Ed.2d 662, the United States Supreme Court adopted the following holding "to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." To that end the Supreme Court held that

> [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . *No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.* [Emphasis added.]

10

*Faragher*, 524 U.S. at 807-08, 118 S.Ct. at 2292-93 (citing *Burlington Industries, Inc. v. Ellerth* (1998), 524 U.S. 742, 762-63, 118 S.Ct. 2257, 2269, 141 L.Ed.2d 633).

¶27 Similarly, this Court has previously held that "culpable acts of continuing discrimination in the work place primarily [take] the form of the *employer's* failure to seriously and adequately investigate and discipline [the harasser] following the assault and the *employer's* subsequent failure to protect [the victim] on the job." *Benjamin v. Anderson*, 2005 MT 123, ¶ 54, 327 Mont. 173, ¶ 54, 112 P.3d 1039, ¶ 54 (emphasis added).

¶28 In this case, Fred's harassment culminated in a tangible employment action—an "undesirable reassignment" to a schedule that Angela was unable to work because of her child, thereby forcing Angela to quit. Moreover, when Angela complained to Janet about Fred's behavior, rather than disciplining Fred or attempting to protect Angela on the job, Janet told Angela that as a bartender Angela would need to be able to deal with sexual comments and that people misunderstood Fred because he is overly friendly. By failing to do anything to change Fred's behavior, Janet created a workplace permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of Angela's employment and create an abusive working environment. *Beaver*, ¶ 30 (citing *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405).

¶29 Based on the foregoing, we conclude that ¶ 23 of the Hearing Examiner's Findings of Fact is dispositive of this case:

> [Janet] did not tolerate a female employee criticizing her son's behavior toward women. Because of her refusal to consider any complaints against [Fred], and her hostile acts toward [Angela] because she complained, *[Janet]*

11

*made it a condition of employment that [Angela] endure [Fred's] conduct without complaining or resisting.* [Janet] had notice of prior complaints regarding sexual harassment of female employees by [Fred]. She rejected all such complaints. [Janet] does not believe that her son ever sexually harassed anyone at any time, or that he ever would. [Fred's] conduct toward [Angela] and around her was offensive, *but it was [Janet's] response to [Angela's] complaint that created the hostile environment that [Angela] had feared.* [Emphasis added.]

¶30 Accordingly, we hold that the District Court erred in affirming the HRC's reversal of the Final Agency Decision and we reverse and remand for further proceedings consistent with this Opinion.

¶31 Reversed and remanded.


/S/ JAMES C. NELSON


We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE