

DA 12-0515

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 223

CASSIE PUSKAS,

       Plaintiff and Appellant,

   v.

PINE HILLS YOUTH CORRECTIONAL FACILITY;
TERI YOUNG, in her official capacity as acting
Superintendent; MONTANA DEPARTMENT OF
CORRECTIONS, and JOHN DOES A-ZZ,

       Defendants and Appellees.


APPEAL FROM:    District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause No. BDV 2010-1217
                   Honorable Jeffrey M. Sherlock, Presiding Judge


COUNSEL OF RECORD:

       For Appellant:

              Alex Rate, Rate Law Office, P.C., Helena, Montana

       For Appellee:

              McKenzie Hannan, Special Assistant Attorney General, Montana Department
              of Corrections, Helena, Montana


                        Submitted on Briefs:  May 8, 2013
                                  Decided:  August 13, 2013


Filed:

                          _____
                                    Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Appellant Cassie Puskas (Puskas) appeals the decision and order from the First Judicial District Court, Lewis and Clark County, that denied Puskas's sexual harassment, hostile work environment, and retaliation claims against Appellee Pine Hills Youth Correctional Facility (Pine Hills).  We affirm.

¶2    We address the following issues on appeal:

¶3    *Whether substantial credible evidence supports the District Court's determination that Pine Hills held open an offer for Puskas to transfer units from June 2009 until Puskas quit in 2010?*

¶4    *Whether the District Court correctly determined that Pine Hills reasonably and promptly offered a solution to end A.H.'s harassment of Puskas?*

¶5    *Whether the District Court correctly dismissed Puskas's retaliation claim against Pine Hills?*

## FACTS

¶6    Pine Hills serves as a youth correctional facility for male inmates up to age 18.  Pine Hills is composed of five separate units, including a sex offender unit, a chemical dependency unit, and a maximum security unit.   Puskas worked at Pine Hills as a correctional officer from December 2006 to January 2010.   Puskas worked in the sex offender unit during the majority of her time employed at Pine Hills.  All parties agree that Puskas had been a quality employee.

¶7    Puskas's immediate supervisor served as the "shift manager" for the particular shift.

2

The shift manager's immediate supervisors are "unit managers." Shad Barrows (Barrows) served as Puskas's unit manager for the majority of Puskas's employment. Jodi Kirkwood (Kirkwood) later held this position.

¶8　Pine Hills imposes three levels of discipline on its inmates. Immediate disciplines, such as having to eat in a cell or miss a movie, represent the least severe. A serious behavior report represents the next level. The most severe offenses constitute "major rules violations" (MRV), such as assaultive behavior, deviate sexual conduct, or masturbation. Pine Hills submits MRVs to a discipline committee that either approves or disapproves the proposed disposition. Pine Hills's upper level management personnel comprise part of the review committee.

¶9　Masturbation by inmates proved to present a confusing policy at Pine Hills. Officers testified that an inmate's masturbation was acceptable if the youth did it in his cell, at night, and under the covers of his bed. Some officers deemed an inmate's masturbation in front of the small window in the door while watching staff, or while exposed in the youth's room, to constitute an MRV. Other officers testified, however, that they would just walk on by if they saw an inmate masturbating in his room.

¶10　Barrows circulated a memorandum in October 2009 to Puskas and other correctional officers in the sex offender unit. Barrows noted that "[t]here is NO such thing as an MRV for masturbating during programming hours." In the very next sentence, however, Barrows declares that "[i]f a youth is masturbating with the obvious intent that staff members/youth seeing him (ex: [s]tanding at his door, sitting on the bed facing the door window . . .), this

3

would be an MRV." The memorandum further provided that "[i]f you have to look in the window and try to ascertain if the youth is masturbating[,] this is probably not an MRV."

¶11 A.H. was an inmate at Pine Hills from October 2008 to June 2010. A.H. "aged out" of the youth correctional system when he turned 18 in June 2010. Pine Hills housed A.H. in the sex offender unit during most of his time at Pine Hills. By most accounts A.H. appeared to be "a very unpleasant young man." He often clashed with correctional officers.

¶12 A.H. suffered from mental health issues that included manic depression and obsessive compulsive disorder. A.H. often threatened Pine Hills's staff and others. He occasionally would assault correctional officers by spitting blood or throwing urine and feces-laden toilet paper at them. Pine Hills twice transferred A.H. from the sex offender unit to the maximum security unit for short time periods due to these outbursts.

¶13 A.H. also frequently masturbated. He made no attempt to hide his masturbation from others. In fact, A.H. often targeted female correctional officers with his masturbation. A.H. would masturbate at the door of his cell while waiting for a female correctional officer to make her regular rounds. Kim Johnson and Lisa Malloy, two female officers, testified that they feared A.H. The two officers further testified that A.H. targeted them with his masturbatory behavior.

¶14 Correctional officials reported A.H. for multiple behavior issues between December of 2008 and January 15, 2010. Pine Hills's records indicate that A.H.'s reported violations included: masturbation twenty times; threatening staff five times; assaulting other inmates five times; sexually assaulting staff two times; threatening another inmate; threatening to kill

4

a staff member; touching the groin of another youth; and exhibiting threatening behavior. Puskas reported at least 14 of these infractions.

¶15 A.H. would follow Puskas around the sex offender unit. A.H. would sit by Puskas in common areas. A.H. would attempt to brush up against her. A.H. would make a concerted effort to have Puskas perform A.H.'s routine pat-downs. This attention prompted other correctional officers to make sure that A.H. and Puskas were in separate areas while the youths were exercising. A.H.'s actions eventually led Pine Hills to assign Puskas to work temporarily in the maximum security unit to be away from A.H. in June 2009.

¶16 A.H. threatened to kill Puskas on January 14, 2010. Puskas was in a common area when she noticed A.H. standing at his door window. A.H. was masturbating. Puskas ordered A.H. to back away from the door. A.H. threatened Puskas, "I will fucking kill you bitch."

¶17 Puskas met the next day with Teri Young (Young), Pine Hills's director of care and custody, to discuss the incident and her concerns about A.H.'s behavior. Puskas grew extremely upset and loud during this meeting. Young offered to transfer Puskas to another of Pine Hills's units. Pine Hills expects correctional officers to work in all five Pine Hills units. Puskas had worked previously in the maximum security unit for a short time in June 2009 to alleviate her contact with A.H.

¶18 Puskas insisted instead that A.H. be transferred to the maximum security unit. Pine Hills reserves the maximum security unit for the most violent of its inmates. These youth chronically assault staff and other youths. A.H. previously had been transferred to the

5

maximum security unit for two short time periods.

¶19    Pine Hills deemed A.H. an inappropriate candidate to be placed permanently in the maximum security unit. The Youth Court had ordered A.H. to attend inpatient sex offender treatment. Youths in the maximum security unit continue to receive the individualized portion of the sex offender treatment, but not the group treatment portion. Group treatment represents an integral component of sex offender treatment. Pine Hills also worried that A.H. would be victimized in the maximum security unit and might fall prey to violent youths who sought out and assaulted youth sex offenders.

¶20    Young had been unaware of Puskas's concerns with A.H. before their January 15, 2010, meeting.  Many others at Pine Hills knew of Puskas's concerns, including unit managers Barrows, Alice Hougardy, and Jerry Anderson.  Puskas quit her job after her meeting with Young.

¶21    Puskas filed an action against Pine Hills for sexual harassment, hostile work environment, and retaliation.  Puskas alleges that she was afraid to go to work.  Puskas claims anxiety over work exacerbated a physical condition of hers.  Puskas further alleges that she suffered from lack of sleep, vomiting, diarrhea, and nightmares.

¶22    The District Court denied motions for summary judgment filed by both Puskas and Pine Hills.  The District Court held a bench trial on June 14, 2012.  The District Court entered judgment in Pine Hills's favor on all claims.

¶23    The District Court noted that after Puskas left her employment at Pine Hills "A.H.'s behavior improved considerably."  A.H. altered his behavior and talked pleasantly with other

6

staff members and youth. A.H. had "felt somewhat targeted by Puskas." Puskas "was seen by some as overly punitive." The court noted that this allegation against Puskas "is born out in the drastic decrease in [A.H.'s] bad behavior reports that occurred after Puskas left." A.H. "aged out" and was discharged from Pine Hills when he turned 18 in June 2010. Puskas appeals.

## STANDARD OF REVIEW

¶24 The Montana Human Rights Act (MHRA) prohibits an employer from discriminating against a person on the basis of gender. Section 49-2-303(1)(a), MCA. Montana modeled the MHRA after Title VII of the Civil Rights Act of 1964 and we frequently refer to federal case law when construing the MHRA. *Williams v. Joe Lowther Ins. Agency, Inc.*, 2008 MT 46, ¶ 21, 341 Mont. 394, 177 P.3d 1018.

¶25 We determine whether a district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *In re B.M.*, 2010 MT 114, ¶ 14, 356 Mont. 327, 233 P.3d 338. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the trier of fact misapprehended the effect of the evidence, or if the record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *Varano v. Hicks*, 2012 MT 195, ¶ 7, 366 Mont. 171, 285 P.3d 592. We view evidence in the light most favorable to the prevailing party, and we leave the credibility of witnesses and the weight assigned to their testimony for the determination of the trial court. *Mowrer v. Eddie*, 1999 MT 73, ¶ 36, 294 Mont. 35, 979 P.2d 156.

## DISCUSSION

7

¶26 *Whether substantial credible evidence supports the District Court's determination that the option to transfer units was available to Puskas from June 2009 until 2010 when Puskas quit?*

¶27 The District Court determined that Pine Hills had made available to Puskas the option to transfer to another unit since June 2009. Barrows testified that he informed Puskas in June 2009 that she could transfer voluntarily to another unit. Barrows testified that officers "can asked to be moved and they can work in the same shift, but in a different unit." Puskas had transferred between units during her time at Pine Hills. Puskas testified that once, when assigned to work in the medium max unit, she had requested and received an assignment to work instead in the maximum security unit. Others testified that Pine Hills transferred officers from one unit to another as a primary method used to "disengage" an officer from a youth. Officers also testified that they frequently transferred between units.

¶28 Puskas attempts to rebut the testimony of Barrows and the other correctional officers by pointing to contradictory testimony. The mere existence of contradictory evidence, however, fails to overcome the District Court's finding. The District Court assesses the credibility of witnesses and assigns weight to their testimony. *Mowrer*, ¶ 36. We will not overturn the District Court's resolution of competing evidence so long as substantial credible evidence supports the District Court's finding. *Varano*, ¶ 7.

¶29 Puskas also has failed to demonstrate that the District Court misapprehended the effect of the allegedly contradictory evidence. Our review of the record fails to leave us with a definite and firm conviction that a mistake has been made regarding the District Court's

8

determination that Pine Hills made available to Puskas the option to transfer units from June 2009 until 2010 when Puskas quit. *Varano*, ¶ 7.

¶30 *Whether the District Court correctly determined that Pine Hills reasonably and promptly offered a solution to end A.H.'s harassment of Puskas?*

¶31 Puskas asserts both a sexual harassment and hostile work environment claim against Pine Hills. With respect to the sexual harassment claim, the District Court found: (1) that Puskas is a member of a protected class or engaged in protected activity; (2) that Puskas had been subjected to behavior that was based on that protected class; and (3) that the behaviors were unwanted. The parties disputed whether the offensive behaviors were sufficiently severe or pervasive as to alter the conditions of employment.

¶32 The District Court similarly found, with respect to Puskas's hostile work environment claim: (a) that Puskas had been subjected to verbal or physical conduct of a sexual nature; and (b) that the conduct had been unwelcomed. The parties again disputed whether A.H.'s conduct had been sufficiently severe or pervasive to alter the conditions of Puskas's employment and create an abusive work environment. *Freitag v. Ayers*, 468 F.3d at 539; *Stringer-Altmaier v. Haffner*, 2006 MT 129, ¶ 22, 332 Mont. 293, 138 P.3d 419.

¶33 The District Court determined that Pine Hills should not be held liable for the actions of A.H. under either the sexual harassment claim or the hostile work environment claim because Pine Hills's "corrective measures were reasonably calculated to end the harassment and were undertaken promptly." An employer may be held liable for the sexual harassment of its employee by third parties where the employer, its agents, or its supervisory employees,

9

knows or should have known of the conduct and ratifies or acquiesces in the conduct by failing to take immediate and appropriate corrective action. *Freitag*, 468 F.3d at 538; *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2001); 29 C.F.R. 1604.11 (2013).

¶34    Employer liability for a third party's sexual harassment and creation of a hostile work environment arises from the employer's negligence and ratification of the conduct by failing to take reasonable and responsive action to the harassing conduct. *Freitag*, 468 F.3d at 538. In other words, once a plaintiff establishes the initial elements of a sexual harassment claim or a hostile work environment claim, the employer's liability attaches only after it negligently responds, or fails to respond, to the condition created by the third party. An employer's immediate and appropriate corrective actions prevent the employer from being liable for a third party's sexual conduct. *Freitag*, 468 F.3d at 538; *Little*, 301 F.3d at 968; 29 C.F.R. 1604.11 (2013).

¶35    Employers must respond promptly and reasonably upon gaining awareness that an employee is being sexually harassed. *Freitag*, 468 F.3d at 528. The reasonableness of an employer's remedy depends on the ability of the employer to stop harassment by the person who is engaged in the harassment. *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991). An employer who acts promptly and reasonably will not be held liable for the actions of a third party.

¶36    The District Court determined that Pine Hills had available only two potential options to address A.H.'s harassment of Puskas. Pine Hills either could place A.H. permanently in

10

the maximum security unit, or Pine Hills could transfer Puskas to another unit. Puskas argues that Pine Hills should have placed A.H. permanently in the maximum security unit in order to prevent his further harassment.

¶37 The District Court pointed to several factors to support its determination that A.H. was not an appropriate candidate to be placed permanently in the maximum security unit. The maximum security unit at Pine Hills houses only the most violent youths. Those responsible for classification and placement of Pine Hills's youth testified that A.H. was not an appropriate candidate to place permanently in the maximum security unit because he was not a generally violent youth.

¶38 Additionally, the Youth Court had ordered A.H. to complete sex offender treatment. Part of A.H.'s sex offender treatment required that he participate in group therapy. Group therapy is not available to youths who are housed in the maximum security unit. If Pine Hills placed A.H. permanently in the maximum security unit he would not have been able to comply with his sex offender treatment requirements.

¶39 The District Court also cited legitimate concerns that A.H., as a sex offender, would be targeted for violence by other youths in the maximum security unit. Pine Hills seeks to rehabilitate youths without employing retribution or punishment. Section 41-5-102, MCA. Pine Hills could not place A.H. permanently in the maximum security unit solely as a punitive measure. These reasons provide substantial credible evidence to support the District Court's determination that A.H. was not an appropriate candidate to be placed permanently in the maximum security unit. As a result, the District Court determined that Pine Hills's

offer to transfer Puskas to a different unit represented the only reasonable option available to remedy A.H.'s harassment.

¶40 Substantial credible evidence, when viewed in the light most favorable to Pine Hills—the prevailing party—also supports the District Court's determination that Pine Hills acted promptly to address A.H.'s harassment of Puskas once Pine Hills became aware of A.H.'s conduct and the impact that conduct was having on Puskas. *See Mowrer*, ¶ 36; *Campbell v. Garden City Plumbing and Heating, Inc.*, 2004 MT 231, ¶ 19, 322 Mont. 434, 97 P.3d 546 (providing that for sexual harassment to be found a plaintiff must have perceived, both in fact and objectively, her work environment to have been altered to the extent so as to have become hostile or abusive).

¶41 The District Court determined that "[t]here is no question that A.H.'s behavior had a serious impact on Puskas." The District Court made no express finding, however, as to when the severity or pervasiveness of A.H.'s conduct began to alter Puskas's conditions of employment. The District Court also did not determine when Pine Hills should have or had become aware of the impact that A.H.'s conduct was having on Puskas. Courts determine this remaining factor based on the totality of the circumstances. *Benjamin v. Anderson*, 2005 MT 123, ¶ 53, 327 Mont. 173, 112 P.3d 1039 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993)).

¶42 Puskas asserts that Pine Hills learned that A.H.'s conduct had become sufficiently severe or persuasive when Puskas first wrote A.H. an MRV for masturbation in January 2009. Puskas points to the fact that several of her supervisors served on the committee that

reviews all MRVs. Puskas argues that Pine Hills thereafter would have been on notice that Puskas had been sexually harassed and a duty attached for Pine Hills to address the harassment reasonably and promptly.

¶43 Under general circumstances, a notice to an employer that a third party had been masturbating in front of the employee would put an employer on notice that the employee is being subjected to unwanted sexual conduct. *See Freitag*, 468 F.3d at 540. Likewise, this fact generally would require the employer to recognize that the conduct itself is sufficiently severe or pervasive as to alter the employee's conditions of employment. *See Little*, 301 F.3d at 968. We must evaluate Puskas's claim, however, under the totality of the circumstances. *Freitag*, 468 F.3d at 539-40.

¶44 The circumstances include the fact that Pine Hills serves as a youth correctional facility and the unique problems associated with a facility of that nature. Puskas was working in the sex offender unit. As repeatedly noted by the District Court, in a youth sex offender unit, one would expect to see some amount of masturbation. A.H. and other inmates in the sex offender unit are young teenagers whose improper sexual activity had required that they be isolated from society. *See Slayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000) (stating that "[p]risoners, by definition have breached prevailing societal norms in fundamentally corrosive ways."). Pine Hills inmates in the sex offender unit frequently masturbate.

¶45 We decline to disturb the District Court's determination that Puskas's write-up of A.H. for an MRV failed to put Pine Hills on notice that Puskas had begun to perceive her

13

conditions of employment as having changed. Pine Hills offered Puskas the option to transfer once Puskas communicated to her supervisor that she perceived the conditions of her employment to have changed. Pine Hills made this option available to Puskas at the same time that Puskas made her view known to Pine Hills. We agree with the District Court that Pine Hills acted reasonably and promptly when it became aware that A.H.'s behavior had become sufficiently severe or pervasive to alter the conditions of Puskas's employment conditions.

¶46 *Whether the District Court correctly dismissed Puskas's retaliation claim against Pine Hills?*

¶47 Puskas asserts that Pine Hills retaliated against her "when [Pine Hills] attempted to force her to transfer units after she engaged in protected activity." To establish a p*rima facie* retaliation case a plaintiff must show: (1) that she was engaged in a protected activity; (2) that she was subjected to an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse employment action. *Rolison v. Bozeman Deaconess Health Services,* 2005 MT 95, ¶ 17, 326 Mont. 491, 111 P.3d 202. The District Court determined that Puskas had failed to establish that she had been subjected to an adverse employment action based upon her complaint against A.H.

¶48 We agree with the District Court that Pine Hills possessed a legitimate, non-discriminatory reason to transfer Puskas to another Pine Hills unit. Pine Hills had to balance its need to protect Puskas from A.H.'s harassment against its need to provide A.H. with access to sex offender treatment as required by the Youth Court's commitment order. A.H.

14

could participate in group therapy sessions only in the sex offender unit. A.H. also likely would have been targeted for harm in the maximum security unit. Finally, A.H. soon would "age out" of Pine Hills.

¶49 All of these factors supported Pine Hills's decision to have offered Puskas a transfer as a reasonable means of protecting her from A.H.'s harassment. Puskas cannot establish that Pine Hills's proffered explanation for seeking to transfer Puskas was pretextual, and, therefore, her retaliation claim must fail. *See Vasquez v. Co. of L.A.*, 349 F.3d at 647 (9th Cir. 2003) (citing *Ray*, 217 F.3d at 1240).

¶50 Affirmed.

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE