No. 01-241

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 312

VORTEX FISHING SYSTEMS, INC.,

Plaintiff and Appellant,

v.

BEN and LACHELLE FOSS,

Defendants and Respondents.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kenneth E. O'Brien, Hash & O'Brien, PLLP, Kalispell, Montana

For Respondents:

Dean D. Chisholm, Kaplan & Chisholm, PLLP, Columbia Falls, Montana

Submitted on Briefs: October 4, 2001
Decided: December 31, 2001

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Plaintiff, Vortex Fishing Systems, Inc., filed a Petition for Judicial Review in the District Court for the First Judicial District in Lewis & Clark County of a Montana Human Rights Commission order which found that Vortex had illegally discriminated against one of the Defendants, Ben Foss, based on marital status. The District Court affirmed the HRC order. Vortex appeals the District Court's judgment. We affirm the judgment of the District Court.

¶2 The following issues are presented on appeal:

¶3 1. Did the District Court err when it affirmed the finding that Vortex discriminated against Ben Foss because of his marital status?

¶4 2. Did the District Court err when it affirmed the HRC's award of lost wages without offsetting unemployment compensation benefits?

¶5 3. Did the District Court err when it affirmed the HRC's award of $2,500 for emotional distress damages?

## FACTUAL BACKGROUND

¶6 Vortex Fishing Systems, Inc., was a manufacturer of electronic fishing lures, based in Kalispell, Montana. In 1994, Vortex adopted an unwritten policy which prohibited the hiring of relatives. It contends it adopted the policy because: (1) supervisors tend to bestow favors upon other employed relatives; (2) if one relative takes an unexcused absence from work, other relatives are also likely to take time off; (3) if one relative is terminated, remaining relatives become disgruntled or quit; and (4) employment of relatives makes pilferage more likely.

¶7 On June 24, 1996, Vortex hired LaChelle Atkinson. On August 15, 1996, Vortex hired Ben Foss. Both LaChelle and Ben were production employees. In January of 1997, they began living together. In late April or early May of 1997, LaChelle and Ben submitted a request to take time off during the week of May 5, 1997, to get married. Ray Scott, the president of Vortex, met with the two to discuss their request for time off. They requested

time off for Wednesday, Thursday, and Friday of that week. Because of a heavy work load and absenteeism, Scott was unable to accommodate their request. They were advised that if they took unauthorized time off, they may be subject to termination.

¶8 Scott also reminded LaChelle and Ben that Vortex had a company policy that relatives could not be employed simultaneously and that when they got married, one of them would have to leave Vortex's employment. They were informed that they could decide who would continue working but if they did not, Vortex would retain the employee with the most seniority. Following the meeting, Ben told fellow employees that he was quitting because of the policy. Neither LaChelle nor Ben reported for work the week of May 5. On May 7, 1997, Ben asked Scott if he and LaChelle could continue to work if they did not get married. Scott informed Ben that was not a possibility. Ben and LaChelle were married on May 10, 1997.

¶9 Ben applied for unemployment benefits and received $1,160. As a result of leaving Vortex just days before their wedding, the Fosses alleged they subsequently had difficulty finding work, lost sleep over their economic hardships, had to move in with relatives, had to borrow money from relatives, and had to sell their automobiles for sustenance. Vortex laid off all production employees on July 3, 1997, in preparation of moving its operation to Arizona.

¶10 Ben and LaChelle filed a complaint with the Department of Labor and Industry in which they alleged that Vortex had discriminated against them based on marital status. Following a hearing, the Hearing Examiner concluded that Vortex had unlawfully discriminated against Ben. The Hearing Examiner awarded Ben $2,400 for back wages, plus interest, and $2,500 for emotional distress. The Hearing Examiner found that LaChelle's discharge was not a result of discrimination, but a result of her three days of unexcused absence. LaChelle did not appeal the Hearing Examiner's determination.

¶11 Vortex appealed the Hearing Examiner's decision to the Human Rights Commission, where it was affirmed. Vortex then filed a Petition for Judicial Review in the First Judicial District, which affirmed the HRC and awarded Ben attorney fees. Vortex filed a Notice of Appeal on February 28, 2001.

## STANDARD OF REVIEW

¶12 A district court reviews an administrative decision in a contested case to determine

whether the findings of fact are clearly erroneous and whether the agency correctly applied the law. *Laudert v. Richland County Sheriff's Dept.*, 2000 MT 218, ¶ 14, 301 Mont. 114, ¶ 14, 7 P.3d 386, ¶ 14; *see also* § 2-4-704, MCA. We employ the same standard when reviewing a district court order which affirms or reverses an administrative decision. *Laudert*, ¶ 14; *Langager v. Crazy Creek Prods., Inc.*, 1998 MT 44, ¶ 13, 287 Mont. 445, ¶ 13, 954 P.2d 1169, ¶ 13.

## DISCUSSION

### ISSUE 1

¶13 Did the District Court err when it affirmed the finding that Vortex discriminated against Ben Foss because of his marital status?

¶14 Employment discrimination is prohibited by the Montana Human Rights Act (MHRA) pursuant to § 49-2-303(1)(a), MCA, which provides:

> (1) It is an unlawful discriminatory practice for: (a) an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of race, creed, religion, color, or national origin or because of age, physical or mental disability, *marital status*, or sex when the reasonable demands of the position do not require an age, physical or mental disability, *marital status*, or sex distinction; . . . . [Emphasis added.]

¶15 In *Martinez v. Yellowstone County Welfare Dept.* (1981), 192 Mont. 42, 626 P.2d 242, this Court adopted the three-part test for employment discrimination articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. First, the plaintiff must establish a prima facie case of discrimination. *Martinez*, 192 Mont. at 48, 626 P.2d at 246. Establishing the prima facie case "creates a presumption that the employer unlawfully discriminated against the plaintiff." *Hearing Aid Inst. v. Rasmussen* (1993), 258 Mont. 367, 372, 852 P.2d 628, 632. If the plaintiff establishes the prima facie case, the burden shifts to the employer to rebut the presumption of discrimination by producing a legitimate, nondiscriminatory reason for its actions. *Hafner v. Conoco, Inc.* (1994), 268 Mont. 396, 404, 886 P.2d 947, 952. After the employer has produced a legitimate, nondiscriminatory reason for its actions, the plaintiff has the opportunity to prove, by a preponderance of the evidence, that the

legitimate reasons offered by the employer are only a pretext for discrimination. *Hafner*, 268 Mont. at 405, 886 P.2d at 953.

¶16 The elements constituting a prima facie case of discrimination depend upon the facts of the case. Rule 24.9.610(2)(a), ARM; *See Martinez*, 192 Mont. at 48, 626 P.2d at 246 (discussing elements of a prima facie case of employment discrimination based on race); *Reeves v. Dairy Queen, Inc.*, 1998 MT 13, ¶ 21, 287 Mont. 196, ¶ 21, 953 P.2d 703, ¶ 21 (discussing elements of a prima facie case of employment discrimination based on a physical disability).

¶17 In cases of alleged employment discrimination resulting in termination, based on marital status, the plaintiff must prove the following prima facie elements: (1) the claimant belonged to a protected class; (2) the claimant was otherwise qualified for continued employment; and (3) the claimant was denied employment under circumstances that raise a reasonable inference that he was treated differently because of his membership in the protected class. Rule 24.9.610(2), ARM; *see generally Reeves*, ¶ 21. We will address each element in turn.

## A. *Member of a Protected Class*

¶18 Ben asserts that he is entitled to protection under the MHRA because he announced his intention to marry, and was told that the change in his marital status would be cause for termination. Vortex contends that at the time Ben left Vortex, on May 5, 1997, he was not a "married person," and, therefore, was not a member of the protected class. He married on May 10, 1997.

¶19 The record is clear that Ben decided to quit because Vortex was going to fire him if he married LaChelle. In the May 5, 1997, meeting, Scott reiterated the no-relative policy specifically because he knew that Ben intended to marry within the week. Ben did marry within the week and quit his employment because of Scott's threat. We conclude that Ben was a member of a protected class. It was the change in his status to "married person" that jeopardized his employment.

## B. *Otherwise Qualified for Continued Employment*

¶20 The second element of a prima facie case of discrimination requires Ben to show that he was otherwise qualified for continued employment in the position. Rule 24.9.610(2)(a)

(ii), ARM. The parties do not dispute the fact that Ben was otherwise qualified for the job and had been a satisfactory employee.

## C. Denied Employment Because of His Membership in a Protected Class

¶21 Finally, Ben must show that he was denied continued employment at Vortex under circumstances which raise a reasonable inference that Ben was treated differently because of his membership in a protected class. Rule 24.9.610(2)(a)(iii), ARM. Examples of such evidence may include any proof that there is a causal connection between Vortex's adverse action and Ben's membership in the protected class. Rule 24.9.610(2)(b)(v), ARM. Although Vortex contends "there is no evidence in the record to support that Ben Foss was terminated because of his marital status," we disagree. Ben testified at the administrative hearing that the only reason he left his employment was because he was about to be fired when he married LaChelle. There is no other apparent reason why Ben would have left his job, but for his belief that he would soon be fired. Because of his membership in the protected class, he was denied further employment with Vortex. The Vortex policy, in effect, gave Ben a choice between his job and his marriage. The record supports the finding and conclusion that Ben proved a prima facie case of employment discrimination.

## D. Whether a Legitimate, Nondiscriminatory Reason Exists

¶22 Because Ben established a prima facie case of unlawful discrimination, the burden shifts to Vortex to produce evidence of a legitimate, nondiscriminatory reason for its actions. Rule 24.9.610(3), ARM.

¶23 Vortex contends that it adopted the no-relative policy for the following reasons: (1) supervisors tend to bestow favors upon other employed relatives; (2) when relatives are working and one decides to take time off, it usually results in the other taking time off, which disrupts business; (3) if one relative is terminated, then the other relative becomes either disgruntled or quits; and (4) the employment of relatives makes pilferage more likely.

¶24 The HRC dismissed Vortex's stated reasons as "unconvincing." It found that with regard to potential favoritism, the anti-nepotism policy as applied was overly broad because it precluded all individuals from marrying even when one individual was not in a supervisory position in relation to the other. The second argument was rejected because the employer retains the ability to approve or disapprove of all leave time. Third, the HRC

found no factual basis for the assertion that when one relative is terminated, the other becomes disgruntled or quits. Similarly, the HRC rejected Vortex's argument that employment of relatives makes pilferage more likely because it lacked any factual basis. Because we conclude, as did the HRC, that there was insufficient evidence of nondiscriminatory reasons for Vortex's anti-nepotism policy, the HRC's conclusion that Vortex illegally discriminated against Ben is affirmed.

## ISSUE 2

¶25 Did the District Court err when it affirmed the HRC's award of lost wages without offsetting unemployment compensation benefits?

¶26 The Hearing Examiner awarded Ben $2,400, plus interest, for back pay, based on a loss of $240 per week through July 3, 1997, the date Vortex ceased its production activities in Kalispell. During the period for which Ben received back pay, Ben also received $1,066 as unemployment compensation benefits. Vortex contends that a failure to deduct from the back pay award the amount of unemployment compensation benefits received by Ben would result in a windfall to Ben. We disagree.

¶27 The purpose of the remedies provided by Montana's Human Rights Act is to return employees who are victims of discrimination to the position they would have occupied without the discrimination. When a collateral source mitigates the employee's loss, we must decide, as with other collateral sources, who should receive the benefit.

¶28 We conclude that between the employer, whose actions caused the discharge, and the employee, who most likely suffered other noncompensable losses, the burden should be placed on the employer. We are confident that the Legislature did not intend by unemployment insurance to insure employers against an award of back pay in the event that an employer illegally discharges an employee in violation of the MHRA. Therefore, we conclude that the District Court did not err when it refused to offset the back pay award by unemployment compensation received by Ben.

## ISSUE 3

¶29 Did the District Court err when it affirmed the HRC's award of $2,500 for emotional distress damages?

¶30 Upon a finding of discrimination, the HRC may:

> (a) prescribe conditions on the accused's future conduct relevant to the type of discriminatory practice found;
>
> (b) require *any reasonable measure* to correct the discriminatory practice and to rectify *any harm, pecuniary or otherwise*, to the person discriminated against;
>
> (c) require a report on the manner of compliance.

§ 49-2-506(1), MCA. (Emphasis added.) We have previously recognized that emotional distress damages fall within § 49-2-506(1), MCA. *Vainio v. Brookshire* (1993), 258 Mont. 273, 281, 852 P.2d 596, 601.

¶31 Vortex contends that emotional distress damages should only be allowed where a claimant introduces evidence that satisfies the burden established in *Sacco v. High Country Indep. Press* (1995), 271 Mont. 209, 896 P.2d 411. In *Sacco*, we described the degree of proof necessary to support an award of damages in an independent action for intentional or negligent infliction of emotional distress. We held that absent physical or mental injury, emotional distress damages could only be awarded if there is a substantial invasion of a legally protected interest that causes a significant impact upon the claimant. Such impact must be serious and such that no reasonable person should be expected to endure it. *Sacco*, 271 Mont. at 237, 896 P.2d at 428. Vortex contends that the emotional distress suffered by Ben did not rise to a level serious enough to support damages based on the *Sacco* standard.

¶32 Therefore, the question before us is whether the rule established in *Sacco* for independent causes of action applies to emotional distress damages awarded in a discrimination context pursuant to the MHRA. We hold *Sacco* is inapplicable to the present case because it was based on the tort of intentional infliction of emotional distress, not a deprivation of human rights. This Court has not previously had an opportunity to address this question. However, because the MHRA is closely modeled after Title VII of the Federal Civil Rights Act of 1964, reference to pertinent federal case law is both useful and appropriate. *Snell v. Montana-Dakota Utils. Co.* (1982), 198 Mont. 56, 62, 643 P.2d 841, 844.

¶33 For the most part, federal case law involving anti-discrimination statutes draws a

distinction between emotional distress claims in tort versus those in discrimination complaints. Because of the "broad remunerative purpose of the civil rights laws," the tort standard for awarding damages should not be applied to civil rights actions. *Bolden v. Southeastern Pennsylvania Transp. Auth.* (3d Cir. 1994), 21 F.3d 29, 34; *see also Chatman v. Slagle* (6th Cir. 1997), 107 F.3d 380, 384-85; *Walz v. Town of Smithtown* (2d Cir. 1995), 46 F.3d 162, 170. As the Court said in *Bolden*, in many cases, "the interests protected by a particular constitutional right may not also be protected by an analogous branch of common law torts." 21 F.3d at 34 (*quoting Carey v. Piphus* (1978), 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252). Compensatory damages for human rights claims may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances. *Johnson v. Hale* (9th Cir. 1991), 940 F.2d 1192, 1193. Furthermore, "the severity of the harm should govern the amount, not the availability, of recovery." *Chatman*, 107 F.3d at 385.

¶34 As the HRC found, the record reveals evidence of emotional distress. Testimony showed that Ben subsequently had difficulty finding work, lost sleep given his economic hardship, had to move in with relatives, was hounded by collection agencies, had to borrow money, and had to sell his automobile for sustenance. Given the broad remedial nature of § 49-2-506(1)(b), MCA, we conclude that the tort standard for proof of independent actions for emotional distress does not apply to civil rights cases brought pursuant to the MHRA and that HRC's award of $2,500 for emotional distress damages was adequately supported by the record.

¶35 The judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JIM RICE

/S/ PATRICIA COTTER

/S/ JAMES C. NELSON

/S/ JIM REGNIER