JUSTICE COTTER,
concurring in part and dissenting in part.
¶68 I concur in the Court’s decision on Issues 1 and 2. I respectfully dissent, however, from the Court’s decision to remand this case for further proceedings in the District Court. The substantial evidentiary record in this case establishes that DEQ discriminated against McDonald in violation of the MHRA and that McDonald suffered damages as a result. She is entitled to prompt relief. Delaying her award of damages (which includes the cost of a replacement service dog) at this point only adds insult to injury and compounds the State of Montana’s failure to provide a reasonable accommodation to one of its own employees.
¶69 The District Court and this Court apply the exact same standards of review to the hearing examiner’s decision. Opinion, ¶ 38. Applying those standards and the relevant legal principles, I would conclude that McDonald’s requested accommodation was reasonable, that DEQ’s delay in providing an accommodation amounted to an adverse employment action, and that the hearing examiner’s award of damages is not clearly erroneous.
1. Was McDonald’s requested accommodation reasonable?
¶70 It is unlawful for an employer not to make “reasonable” accommodations to the known physical or mental limitations of an *267 otherwise qualified employee with a disability. Sections 49-2-101(19)(b), -303(l)(a), MCA; Admin. R. M. 24.9.606(l)(a); 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). Under Montana law, “[a]n accommodation to a person with a physical or mental disability for the purpose of enabling the person to perform the essential functions of an employment position is reasonable unless it would impose an undue hardship upon the employer” or “would endanger the health or safety of any person.” Admin. R. M. 24.9.606(4), (6). The employer has the burden to show that the accommodation would impose an undue hardship upon the employer or endanger the health or safety of any person.[1] See Admin. R. M. 24.9.606(l)(a), (4), (6).
¶71 I first address undue hardship. For purposes of determining whether an accommodation is reasonable, “undue hardship”means “an action requiring significant difficulty or extraordinary cost” when considered in light of the following factors:
* The nature and expense of the accommodation needed.
* The overall financial resources of the facility or facilities involved in the provision of the accommodation, the number of persons employed at the facility, the effect on expenses and resources of the facility, and other impacts of the accommodation on the operation of the facility.
* The overall financial resources of the business, the overall size of the business of the employer with respect to the number of employees, and the number and type and location of the facilities of the employer.
* The type of operation or operations of the employer, including composition, structure, and functions of the work force of the employer, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the employer.
Admin. R. M. 24.9.606(5)(a)-(d). Applying these factors, the hearing examiner found that there was ‘ho significant difficulty or extraordinary cost” associated with placing runners in the hallways. He noted that the cost of supplying runners ($1,500 to $2,000 according to Smith’s research, and $7,500 to $8,000 according to *268 Olson’s research) was “relatively minimal... compared to the overall financial condition of DEQ.”
¶72 DEQ does not deny that it had a large surplus in its proprietary fund at the time McDonald requested her accommodation and that it could have afforded the runners or carpeting requested by McDonald. Indeed, DEQ admitted at oral argument: ‘The money was there. If we thought it was the right thing4f we needed to do it, we could do it.” Instead, DEQ reiterates its views that she did not need the accommodation and that Bess was performing poorly. DEQ also contends that other ‘inore practical”measures were available and that the cost of runners or carpeting was out of proportion to their benefits.
¶73 With respect to DEQ’s first point, the Court rejects the argument that McDonald did not need her requested accommodation. See Opinion, ¶¶ 42-48. As for DEQ’s second point, DEQ utterly fails to establish that, given Bess’s capabilities, installing runners or carpets would entail significant difficulty or extraordinary cost on DEQ’s part.
¶74 Next, regarding DEQ’s assertion about other measures, it is true that an employer has discretion in deciding which effective accommodation to provide:
If more than one [potential accommodation] will enable the individual to perform the essential functions or if the individual would prefer to provide his or her own accommodation, the preference of the individual with a disability should be given primary consideration. However, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.
29 C.F.R. app. § 1630.9. Here, however, neither of DEQ’s proposed alternative measures can be considered an “effective” potential accommodation. One proposal was to hold meetings in Room 35; yet, as DEQ concedes, this was a “partial solution” at best. The other proposal was dog booties; however, DEQ merely speculates that this “may have been a solution.” The hearing examiner, in contrast, determined that booties were not a viable solution, and DEQ has not shown this determination to be clearly erroneous.
¶75 Lastly, DEQ claims that the cost of runners or carpeting was “excessive” because they would provide Tittle or no job-related benefit to McDonald.” DEQ’s opinion about the benefits to McDonald, however, is based largely on conjecture and assumptions about how long she will need the accommodation. DEQ ignores the benefits to McDonald in the present-for example, the ability to perform her job *269 duties without the encumbrances' caused by her disabilities and, similarly, the ability to enjoy the same level of benefits, privileges, and opportunities of employment as are available to similarly situated employees without disabilities. Moreover, DEQ offers no analysis related to its financial resources or any of the other factors listed in Admin. R. M. 24.9.606(5). The examiner, however, weighed the evidence related to DEQ’s financial resources, the costs of runners and carpeting, and the benefits of the accommodation to McDonald and decided that placing runners in the hallways did not require significant difficulty or extraordinary cost. As McDonald correctly points out, it is not this Court’s role to reweigh the evidence. See §2-4-704, MCA.
¶76 Turning then to health or safety risks, DEQ asserts that mats and runners pose a “significant maintenance challenge”because ‘they must be moved daily to sweep the floors.” That runners are a “challenge” or inconvenience for maintenance staff, however, does not render them a health or safety hazard. Alternatively, DEQ offers a brief argument that runners would have created a ‘trip hazard.” DEQ bases this argument on testimony by two of its witnesses that runners and mats sometimes curl at the comers, become “rumpled,” or get “wrinkles” in them. These witnesses’ testimony, however, appears to be based largely on anecdotal evidence, and it is clear that the hearing examiner did not attribute substantial weight to it. Moreover, DEQ’s argument rings hollow given that not once during the 17 months when McDonald was requesting runners or carpeting did DEQ tell her that runners were not a viable option due to safety issues.
¶77 In this regard, when an employer defends an adverse employment action on the ground that an accommodation would endanger health or safety, ‘the employer’s failure to independently assess whether the accommodation would create a reasonable probability of substantial harm will create a disputable presumption that the employer’s justification is a pretext for discrimination on the basis of disability.” Admin. R. M. 24.9.606(7). “Independent assessment of the risk of substantial harm”is “evaluation by the employer of the probability and severity of potential injury in the circumstances.” Admin. R. M. 24.9.606(8). Here, DEQ did not conduct an evaluation of the probability and severity of potential injury posed by runners or, for that matter, carpeting.
¶78 For these reasons, I would conclude that DEQ’s arguments regarding health and safety risks and the burden on DEQ to provide floor coverings are without merit. McDonald’s requested accommodation was reasonable. I next address whether DEQ’s delay *270 in providing an accommodation constituted an adverse employment action.
2. Did McDonald suffer an adverse employment action?
¶79 One of the elements of a disability-discrimination claim is that the employee suffered an adverse employment action because of her disability. See Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001); Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006); §49-2-303(1)(a), MCA. Adverse employment action includes the failure to make reasonable accommodations to an otherwise qualified employee who has a physical or mental disability. Turner, 440 F.3d at 611 n. 4; §49-2-101(19)(b), MCA. An employer’s delay in providing a reasonable accommodation can amount to a failure to make reasonable accommodations (i.e., a “constructive denial”) and, thus, an adverse employment action. See Selenke v. Medical Imaging of Colorado, 248 F.3d 1249, 1262 (10th Cir. 2001); Krocka v. Riegler, 958 F. Supp. 1333, 1342 (N.D. Ill. 1997); James v. Frank, 772 F. Supp. 984, 992 (S.D. Ohio 1991); cf. Groome Resources v. Parish of Jefferson, 234 F.3d 192, 199-200 (5th Cir. 2000). In evaluating whether the delay in providing a reasonable accommodation amounted to an adverse employment action, courts have considered the length of the delay, the reasons for the delay, whether the employer offered any alternative accommodations while evaluating a particular request, and whether the employer acted in good faith. Selenke, 248 F.3d at 1262-63; but cf. Peebles v. Potter, 354 F.3d 761, 766-67 (8th Cir. 2004) (“[A] claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer’s intent or actual motive.”); accord Higgins v. New Balance Athletic Shoe, 194 F.3d 252, 264 (1st Cir. 1999).
¶80 In this regard, employers are required to engage in an ‘interactive process” with disabled employees to identify and implement appropriate reasonable accommodations. Barnett v. U.S. Air, 228 F.3d 1105, 1111-14 (9th Cir. 2000) (en banc), judgment vacated on other grounds, 535 U.S. 391, 122 S. Ct. 1516 (2002); 29 C.F.R. §1630.2(o)(3), app. § 1630.9. The interactive process, which is triggered by the employee’s request for an accommodation or the employer’s recognition of the need for one, requires good-faith exploration of possible accommodations. Barnett, 228 F.3d at 1112, 1114. The employer should meet with the employee, request information about the condition and what limitations the employee has, ask the employee what she specifically wants, show some sign of having considered her request, and offer and discuss available alternatives when the request is too burdensome. Barnett, 228 F.3d at 1115. Both sides must communicate *271 directly and exchange essential information, and neither side should delay or obstruct the process. Barnett, 228 F.3d at 1114-15. Since the duty to accommodate is a continuing duty which is not exhausted by one effort, the employer’s obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. Humphrey v. Memorial Hospitals, 239 F.3d 1128, 1138 (9th Cir. 2001).
¶81 In the present case, McDonald verbally requested an accommodation in March 2003, put that request in writing in September 2003, and reiterated it numerous times over the ensuing 11 months. Yet, by the time she left her position with DEQ in August 2004, DEQ still had not made a decision about providing the accommodation. As a matter of fact, when McDonald told Livers that she would not stay with DEQ unless the floor problem was resolved, Livers responded that he could not guarantee anything.
¶82 The hearing examiner stated that DEQ provided 'ho rational basis”for this 1 Mi-year delay and that DEQ’s failure to provide runners or an alternative reasonable accommodation was “inexplicabl[e] and unreasonable].” Furthermore, the examiner found that DEQ did not engage in any discussion with McDonald about any course of accommodation except the placement of runners (what McDonald wanted) and holding meetings in Room 35 (which was not a viable solution). Regarding the three small mats provided in November 2003, the examiner noted that McDonald informed DEQ the mats were inadequate and asked that her requested accommodation be implemented, but to no avail. The examiner concluded that DEQ’s conduct was the result of “stereotypical institutional inertia” and held that “[t]he inordinate delay in providing and the ultimate failure to provide the accommodation that McDonald requested was a violation of the law.”
¶83 DEQ challenges the examiner’s decision on essentially two grounds. First, DEQ argues that the absence of runners or carpeting in the hallways did not affect McDonald’s ability to perform the essential functions of her job and, thus, that DEQ’s failure to provide them did not constitute an adverse employment action. This argument is totally without merit. The absence of nonskid floor coverings did affect McDonald’s ability to perform her job duties and to enjoy benefits, privileges, and opportunities of employment on an equal basis as similarly situated employees. Opinion, ¶¶ 47-48.
¶84 Second, DEQ argues that it worked diligently to obtain responses *272 from General Services regarding the provision of runners or carpeting in the hallways but that General Services ‘typically has a long timeframe for response to agency calls for building modifications.” DEQ also contends that it engaged with McDonald in the interactive process but that McDonald’s requests for floor coverings “changed over time.” DEQ implies that these changes caused some of the delay in providing her an accommodation. In short, DEQ argues that it attempted in good faith to accommodate McDonald, but its efforts were stymied by General Services and McDonald herself. This argument too is without merit.
¶85 For one thing, McDonald’s requests were not continually changing. The record clearly establishes that she asked for a nonskid surface in the ground-floor hallways in March 2003 and maintained that request through the last day of her employment with DEQ in August 2004. Her specific suggestion may have varied between runners, mats, and carpeting, but the basic request was always the same: a nonskid floor covering to prevent Bess from slipping. Furthermore, DEQ is patently incorrect in its assertion that McDonald “accepted”the three small mats provided in November 2003 and tacitly withdrew her request for floor coverings along the entire length of the hallways. The mats were woefully inadequate, given that large areas of the tile floors remained uncovered, and McDonald conveyed this fact to Danzer, Cameron, and later Forgey. She never waivered in her request for nonskid floor coverings over all portions of the tile floors that she regularly traveled. The only substantive change occurred in March 2004 when she expanded her request to include the areas outside the first- and second-floor elevator doors. But this expansion does not excuse DEQ’s delay (12 months at that point) in providing nonskid floor coverings in the ground-floor hallways.
¶86 Equally unavailing is DEQ’s attempt to shift blame for its inaction to another state agency. Irrespective of the reasons for General Services’ lack of prompt action, McDonald’s immediate employer was DEQ. As her immediate employer, DEQ was required to provide, in a timely manner, either the reasonable accommodation which she repeatedly requested and which was well within DEQ’s actual and financial ability to provide, or an effective alternative accommodation. DEQ did neither; and the notion that DEQ’s delay can be excused by a sister agency’s failure to treat the matter with “appropriate urgency” (Opinion, ¶ 20) is untenable. A disabled employee who is entitled to a reasonable accommodation must not be held hostage to the sort of “stereotypical institutional inertia”the hearing examiner found in this case.
*273 ¶87 Finally, the record reflects that DEQ did not properly fulfill its obligation to engage in the interactive process with McDonald. From the outset, DEQ took no affirmative steps to identify and provide practical alternative accommodations for McDonald while waiting to hear back from General Services. Even when DEQ was made aware that the three small mats provided by General Services were ineffective, DEQ still did not attempt to identify and provide an effective alternative. Likewise, after learning that General Services would not pay for runners or carpeting, DEQ took no affirmative steps to provide them itself, even though one of its own employees had determined that the cost of runners for the ground-floor hallways was roughly $1,500 to $2,000, which DEQ easily could have afforded. But perhaps most tellingly, the record reflects that when McDonald left her position with DEQ, DEQ had not decided whether it would provide her an accommodation at all. DEQ explains on appeal that it did not believe it had a legal duty to do so and that its efforts to assist McDonald were entirely “voluntary.” Yet if, as DEQ says, it did not believe it was legally required to accommodate McDonald, then it is doubtful that DEQ actually engaged in a genuine, good-faith interactive process with the goal of identifying and providing her a reasonable accommodation.
¶88 For these reasons, the hearing examiner correctly determined that the 17-month delay in providing McDonald’s requested accommodation, to which she was entitled, was inordinate. I agree with the examiner that DEQ’s failure to provide the accommodation or a practical alternative was inexplicable and unreasonable. The delay amounted to a constructive denial of McDonald’s request and, thus, an adverse employment action in violation of DEQ’s obligation to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee. Sections 49-2-101(19)0»), -303(l)(a), MCA; Admin. R. M. 24.9.606(l)(a).
3. Is the hearing examiner’s award of damages clearly erroneous?
¶89 Upon finding that a party has engaged in unlawful discrimination, the hearing examiner may “require any reasonable measure to correct the discriminatory practice and to rectify any harm, pecuniary or otherwise, to the person discriminated against.” Section 49-2-506(1)0»), MCA. Here, the examiner awarded McDonald $10,000.00 for emotional distress, $18,000.00 for areplacement service animal, $1,536.00 for travel expenses to procure the replacement service animal, and $333.84 for veterinary bills. DEQ disputes the awards for emotional distress and replacing Bess. I address these in *274 turn.
Emotional Distress
¶90 As a preliminary matter, DEQ asserts that any emotional distress McDonald may have experienced did not rise to the level of “actionable”emotional distress. This case, however, is not a tort action; and we have previously held that the tort standard for proof of independent actions for emotional distress does not apply to civil rights cases brought pursuant to the MHRA. See Vortex Fishing Systems v. Foss, 2001 MT 312, ¶¶ 31-34, 308 Mont. 8, 38 P.3d 836. Emotional distress damages fall within the meaning of “any reasonable measure ... to rectify any harm”in §49-2-506(l)(b), MCA. Vainio v. Brookshire, 258 Mont. 273, 280-81, 852 P.2d 596, 601 (1993). Compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances. Vortex Fishing, ¶ 33; accord Benjamin v. Anderson, 2005 MT 123, ¶ 70, 327 Mont. 173, 112 P.3d 1039. The severity of the harm governs the amount, not the availability, of recovery. Vortex Fishing, ¶ 33. The amount of damages to be awarded rests in the sound discretion of the fact-finder, but it must be reasonable and supported by substantial evidence. See § 49-2-506(l)(b), MCA; Beaver v. Dept. of Natural Resources and Conservation, 2003 MT 287, ¶ 85, 318 Mont. 35, 78 P.3d 857; Kiely Const. v. City of Red Lodge, 2002 MT 241, ¶ 102, 312 Mont. 52, 57 P.3d 836.
¶91 DEQ contends that the record does not support “any” damages for emotional distress in this case. In making this award, however, the hearing examiner observed that McDonald “was subjected to the distress of having to endure one and one half years of DEQ’s failure to accommodate despite repeated requests”4.e., DEQ’s “stereotypical institutional inertia”-and that she ‘has also experienced some loss of social interaction due to the loss of the service animal.” The record supports both points. First, McDonald presented evidence that she in fact became frustrated and upset with DEQ’s ongoing failure to provide the reasonable accommodation she needed in order to use her service dog at work. Indeed, one of DEQ’s own witnesses testified to this fact, and it certainly can be ‘inferred from the circumstances.” Vortex Fishing, ¶ 33. Moreover, McDonald also presented evidence that she was very dependent on Bess, that Bess’s services were profoundly important to her, and that the loss of those services caused her distress. Without Bess, McDonald had more difficulty completing her work, she would lose hours of time in dissociative episodes, her mobility decreased, she suffered more panic attacks, she became more fearful of leaving the house, she was substantially less social, and her *275 depression worsened. McDonald testified to these facts, as did her psychologist.
¶92 DEQ claims that McDonald’s testimony was “vague and entitled to little weight.” The hearing examiner, however, clearly disagreed, and it is not the reviewing court’s job to second-guess his assessment of McDonald’s credibility. Having heard the testimony and observed the witnesses, the examiner was in the best position to determine their credibility and the weight to be given to their testimony, and his determinations in this regard are entitled to great deference. Benjamin, ¶ 37; §2-4-704(2), MCA. DEQ also claims that McDonald was “very understanding” about DEQ’s delay in providing her requested accommodation. The pertinent question, however, is not whether there is evidence supporting findings different from those made by the examiner; it is whether substantial evidence supports the findings actually made. Benjamin, ¶ 55. Here, the examiner’s finding that McDonald suffered distress as a result of DEQ’s “stereotypical institutional inertia” and the loss of Bess is supported by substantial evidence. DEQ has not shown error in the award of $10,000 for emotional distress damages.
Replacing Bess
¶93 The examiner held that McDonald was entitled to compensation for “the loss of her property due to the failure of DEQ to provide the accommodation.” He found that Bess, “had she not been injured, could have continued to serve McDonald,” but Bess was ‘ho longer useful as a service animal due to the falls the dog incurred at the Metcalf Building.” The examiner further observed that there was ‘ho evidence to show that McDonald can replace the service animal for anything less than $18,000.00.”
¶94 DEQ argues that no damages should be awarded for the loss of Bess because her injuries occurred “on floor conditions that McDonald had approved.” DEQ is referring to the three small mats provided in November 2003 and arguing that because McDonald said she would try the mats, she effectively “approved” the slippery conditions of the remaining uncovered floors where Bess slipped and fell in January and March 2004. This argument is without merit. As noted, McDonald told Danzer and Cameron that the mats were inadequate. Although she agreed to try them, she never withdrew her request for nonskid floor coverings over all portions of the tile floors that she regularly traveled.
¶95 Alternatively, DEQ argues that the award of $18,000 was clearly erroneous. The CARES representative testified that the fair market value of a service dog with Bess’s training is ‘$18,000 and up”but the market value of a dog who can no longer perform services as a service *276 animal is essentially nothing. DEQ, however, posits that CARES would charge McDonald only $500 for a new service dog and that DEQ, therefore, should not be liable for the full $18,000 market value. Moreover, DEQ contends that Bess “was nearly 3A finished with her service life” when she had to be retired and that McDonald, therefore, is entitled to only lA of the $500 replacement fee, i.e., $125.
¶96 This argument founders on several factors. For one thing, DEQ ignores the fact that CARES cannot guarantee it will be able to provide McDonald with a service dog to match her specific physical and mental needs. But regardless, McDonald does not intend to procure a replacement dog through CARES. The process requires her to travel to the training facility and stay there for about seven days of training, working with the new dog, and getting the dog adjusted to being her service dog. For this reason, and because CARES is located in Kansas, McDonald intends to work with a provider located closer to Helena-namely, Great Plains Assistance Dogs Foundation in North Dakota. Notably, the award of $1,536 for travel expenses (which DEQ does not challenge) is based on the costs McDonald would incur traveling to North Dakota.
¶97 Finally, DEQ overlooks the purpose of the remedies provided by the MHRA, which is to return employees who are victims of discrimination to the position they would have occupied without the discrimination. Vortex Fishing, ¶ 27. Here, DEQ produced no evidence that Bess was worth anything less than $18,000 when she had to be retired or that a replacement could be procured for anything less than that amount. As for DEQ’s contention that CARES (or some other organization) might mitigate McDonald’s loss, this Court has held that when a collateral source mitigates an employee’s loss, the employee should receive the benefit. Vortex Fishing, ¶¶ 27-28. In Vortex Fishing, the hearing examiner awarded the employee back pay, although the employee had also received unemployment compensation benefits for the same time period. We affirmed, stating that ‘between the employer, whose actions caused the discharge, and the employee, who most likely suffered other noncompensable losses, the burden should be placed on the employer.” Vortex Fishing, ¶ 28. Likewise here, even assuming, for the sake of argument, that McDonald will receive financial assistance in obtaining a replacement service dog for less than its fair market value, that benefit should accrue to McDonald as the employee who was subjected to illegal discrimination, not DEQ which perpetrated the illegal discriminatory act.
¶98 In conclusion, the hearing examiner had authority under §49-2-506(l)(b), MCA, to impose any reasonable measure ‘to rectify any *277 harm” to McDonald. Given the “broad remedial nature” of this provision, Vortex Fishing, ¶ 34, the examiner determined that anything less than $18,000 would not “rectify”McDonald’s loss of Bess. McDonald presented evidence that the value of a service dog with Bess’s training is ‘$18,000 and up.”DEQ’s claim that she can obtain a service dog for less than its fair market value is based largely on supposition. Moreover, it is inapposite, since any such benefit belongs to McDonald, not DEQ. As the party seeking to overturn the examiner’s award of $18,000 to replace Bess, DEQ bears the burden of demonstrating the examiner’s findings are clearly erroneous. DEQ has not met this burden.
CONCLUSION
¶99 DEQ failed to show that McDonald’s requested accommodation was not reasonable under Admin. R. M. 24.9.606(4) and (6). As a matter of fact, DEQ concedes that it easily could have afforded to install runners or carpeting, and there is no evidence that DEQ conducted the independent assessment required by Admin. R. M. 24.9.606(7) and (8). Moreover, while Bess had difficulty walking on DEQ’s slippery tile floors, DEQ does not deny that she was fully functional on runners and carpeting-which, again, were well within DEQ’s financial ability to provide.
¶100 Yet, DEQ provided McDonald with no accommodations at all, save for the three mats General Services put down in November 2003, which were patently inadequate. Rather, DEQ dragged its heels for 17 months under the apparent belief it had no legal obligation to honor McDonald’s requests. As the Court holds, DEQ was mistaken in this regard and had a duty to address any barriers to her ability to use Bess effectively in the workplace. Opinion, ¶ 64. But I would go further than has the Court and, based on the analysis above, would hold that McDonald’s requested accommodation of runners or carpeting was reasonable and DEQ’s failure to provide that or an effective alternative accommodation constituted an adverse employment action. Finally, I would hold that DEQ has not shown the hearing examiner’s award of damages to be in error. On this basis, I would reverse the District Court’s decision and remand with instructions to reinstate the Final Agency Decision.
¶101 I concur and dissent.

 This scheme differs from the ADA in one respect. Under the ADA, the employee must make an initial showing that the accommodation “seems reasonable on its face, i.e., ordinarily or in the run of cases,” or that “special circumstances warrant a finding that... the requested ‘accommodation’ is ‘reasonable’ on the particular facts.”See U.S. Airways v. Barnett, 535 U.S. 391, 401, 405, 122 S. Ct. 1516, 1523, 1525 (2002); Giebeler v. M & B Associates, 343 F.3d 1143, 1156 (9th Cir. 2003). The employer then must demonstrate undue hardship. See Barnett, 535 U.S. at 402, 122 S. Ct. at 1523.