FILED

12/20/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0603

DA 21-0603

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 245

NORVAL ELECTRIC COOPERATIVE INC.,

> Petitioner, Appellant,
> and Cross-Appellee,

v.

SHALAINE LAWSON,

> Respondent, Appellee,
> and Cross-Appellant.

APPEAL FROM:   District Court of the Seventeenth Judicial District,
In and For the County of Valley, Cause Nos. DV-2020-11 and DV-2020-15
Honorable Yvonne Laird, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:
>
> > Maxon R. Davis, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls, Montana
>
> For Appellee:
>
> > Thomas ("Todd") D. Shea, Jr., Shea Law Office, Bozeman, Montana

Submitted on Briefs:  September 14, 2022

Decided:  December 20, 2022

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     NorVal Electric Cooperative, Inc. (NorVal) appeals the orders entered by the Seventeenth Judicial District Court, Valley County, on review of the Human Rights Commission's (HRC) Final Agency Decision regarding the sexual discrimination claims of Shalaine Lawson (Lawson) against NorVal, her former employer.  NorVal challenges the District Court's affirmance of the HRC's determination that Lawson was subjected to sexual harassment and retaliation, and its increase of the HRC's damage award from $505,957 to $1,379,338.  Lawson cross-appeals the District Court's determination of the amount of attorney fees awarded to her.  We address the following issues:

> *1.  Did the District Court err by upholding the HRC's determination that Lawson was subjected to severe and/or pervasive sexual harassment by NorVal, and that NorVal retaliated against Lawson?*
>
> *2.  Did the District Court err by increasing the "front pay" damages awarded by HRC?*
>
> *3.  Did the District Court abuse its discretion in its determination of Lawson's attorney fee award?*

¶2     We affirm in part, reverse in part, and remand for entry of an amended judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     In December 2010, Lawson, a licensed CPA, began employment with NorVal, an electric cooperative located in Glasgow.  Over the next several years, Lawson advanced in the company, and became NorVal's office manager and chief financial officer in January 2015.  During her tenure, Lawson received satisfactory performance evaluations, and was

given wage increases. She maintained a generally positive working relationship with her immediate supervisor, and NorVal's general manager, Craig Herbert (Herbert).

¶4 However, in May 2017, Herbert began to engage in interactions of a personal nature with Lawson. During a work-related car ride together in May 2017, Herbert asked Lawson why she had begun wearing false eyelashes, stating that "when women go and try to improve their looks, it's because they're looking to have an affair." Lawson, disturbed by Herbert's insinuation, ceased wearing false eyelashes to work. In June 2017, when they were discussing an upcoming conference with NorVal's banking institution, Herbert asked Lawson whether she had ever "fooled around" with a banker connected to the conference. Disturbed by this comment, Lawson did not attend the conference. Later that month, Lawson mentioned taking her son to a football camp in Bozeman and having obtained a massage while there. Later that day, Herbert asked Lawson if her husband gave her massages, adding, "I just wanted you to know that given the opportunity, I give a really good massage, and if we're ever given an opportunity, I would like to get you relaxed." Lawson did not respond and left Herbert's office feeling "degraded, dirty, and really uncomfortable."

¶5 Soon thereafter, Lawson was in Herbert's office discussing NorVal's upcoming annual audit and mentioned that her back hurt. Herbert told Lawson to turn around and cross her arms, closed the office door, and approached Lawson from behind. He embraced her, lifted her up, and popped her back, smelling her hair in the process. Lawson felt Herbert's actions were inappropriate. Several days later, after having not spoken in several

days, Lawson was in Herbert's office to discuss a work-related matter. At the end of the conversation, Herbert requested a hug that he described as, "just for friends," and then gave Lawson a hug.

¶6 In mid-July 2017, while Lawson was using the copy machine, Herbert said to her, "you are filling your pants out nicely." Lawson interpreted Herbert's comments as expressing his interest in pursuing a sexual relationship with her and, as a result, she threw away the pants she had worn that day. During that summer, Herbert entered Lawson's office when she was there alone and inquired about her sex life, a topic Lawson believed inappropriate. She wondered to herself why Herbert did not also feel the question was inappropriate. In August 2017, during a time NorVal was doing power shutoffs, Lawson entered Herbert's office, and he asked her, "are there things that turn you off?" Herbert then used the term "turn off" in a sexual manner several times throughout the day in Lawson's presence.

¶7 During NorVal's September 2017 board meeting, without Lawson present, several board members joked about the existence of a sexual relationship between Herbert and Lawson. One board member had previously accused Lawson and Herbert of having an affair after Lawson's promotion to office manager. Lawson learned of the accusation through Herbert and was upset both by the accusation and NorVal's failure to investigate these comments or allow her to respond.

¶8 During the first week of October 2017, Lawson, Herbert, and other NorVal employees were attending a work conference in Great Falls. Herbert and Lawson had

5

previously arranged to have a work-related meeting during the conference. While there, Herbert requested that Lawson meet him in his hotel room to have their meeting, and had obtained a spare key for Lawson to access his room. The Hearing Officer found Herbert's purpose was to allow Lawson to enter his room separately to avoid raising suspicions, and to engage in a sexual liaison. Lawson refused and became visibly upset. Herbert texted Lawson later in the day and asked to have the meeting beside the hotel pool, which they completed without incident.[1] Herbert had not previously taken these kinds of actions toward other employees—asking about their sex life, if he could give them a massage, if they had "fooled around" with business acquaintances, or giving them a key to his hotel room.

¶9 On October 6, back in NorVal's offices, Lawson felt she needed to tell Herbert that she either needed to report the hotel-room incident or find another job, in order to stop his behaviors. Although she suspected Herbert would fire her, she nonetheless informed him that she had documented the incident. Lawson considered this report as her initial complaint of sexual harassment because NorVal's harassment policy, which prohibits

---

[1] Regarding this incident and several others, NorVal contests the Hearing Officer's findings regarding Herbert's sexual intentions, arguing they were misconstrued. However, as further explained below, the standard for a court's review of an agency's factual findings is narrow and deferential to the factfinder, who receives evidence from the witnesses in person, and is charged with determining the credibility and weight of testimony. *See* § 2-4-704(2), MCA ("[t]he court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact."). Findings of fact may be reversed if they are "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." Section 2-4-704(2)(a)(v), MCA. Upon our review of the whole record here, we have found no basis to conclude the Hearing Officer's findings of fact regarding Herbert's intentions were clearly erroneous.

discrimination and harassment, requires reports of incidents be made to the individual's immediate supervisor, or, if the immediate supervisor is involved in the harassment, to the general manager. Herbert was Lawson's alleged harasser, her immediate supervisor, and the general manager and, because there was no provision in NorVal's policy for addressing complaints against the general manager, the Hearing Officer concluded that Lawson's actions during this meeting constituted the oral making of a harassment complaint. On October 9, 2017, Herbert and Lawson again met and, despite Lawson's request for a Board member to attend the meeting, no Board member was present. At that meeting, Herbert informed Lawson that "they needed to work it out or she needed to go," to which Lawson requested guidance regarding how to properly report her complaint in writing. Herbert instructed her to speak only with him. When Lawson questioned the propriety of that directive, Herbert repeated it. Herbert verbally notified the Board of Lawson's complaint, but did not submit anything in writing. Lawson asked Herbert repeatedly how she could formally submit her complaint. Herbert did not provide such instructions, and the Board did not meet with Lawson despite her repeated requests for such a meeting.

¶10     On October 10, 2017, Lawson received a letter written by NorVal's attorney, Matthew Knierim (Knierim), notifying Lawson that she was being formally reprimanded by Herbert for creating a toxic work environment, failing to understand the chain of command, challenging Herbert's authority, criticizing the Board over tax issues, and complaining over another employee's performance. The letter stated that "[t]his is not

acceptable and if it occurs again, you will be immediately terminated for cause."[2]  Herbert hand-delivered the letter to Lawson in the office and, in a text, asked Lawson to call him that evening, at which time Herbert offered Lawson a severance package if she would leave immediately.  Lawson declined the offer, asserted that she had done nothing wrong, and stated that she just wanted the sexual harassment to end.

¶11    The next day at work, Herbert told Lawson he did not want to sleep with her.  He showed Lawson a picture of a woman on his computer and told her that he and the woman had spent several months together traveling for work, staying in the same room, laying on the same bed, and it was not a "big deal."  Over the following weeks, Lawson continued to inquire of Herbert how to properly report her sexual harassment complaint, with no response.  Lawson attempted to communicate with Knierim, who explained Lawson would have to report to Herbert.

¶12    Coinciding with Lawson's harassment complaints, Herbert began treating Lawson in a way she felt to be degrading or belittling during their conversations about work topics.  He instructed Lawson to notify him whenever she intended to leave the office.  He removed Lawson from her role as minutes-taker for meetings of the Board, without any job-related justification.

¶13    During the time of Herbert's behaviors and overtures to her, Lawson began showering less and stopped wearing nice clothes to the office to "ward [Herbert] off."

---

[2] Knierim wrote the reprimand letter at Herbert's instance, but Knierim had not been advised and had no knowledge at this time of Lawson's sexual harassment concerns and complaint.

Lawson began suffering a loss of self-worth, and confided in her husband about Herbert's behavior and its effect upon her. He began contacting area attorneys for advice about recourse for sexual harassment. Seeking medical assistance, Lawson consulted Elizabeth Drydahl, LCPA, LAC, who strongly recommended Lawson's hospitalization on account of her severe depression and "plan to harm herself" resulting from "very inappropriate attention from a coworker." Lawson's husband took her to Havre's emergency room, where she was diagnosed with "depression and suicidal ideation" and referred to Dr. Jennifer Durward, APRN, PMHNP-BC, (Durward), a psychiatric nurse practitioner. Lawson relayed her sexual harassment encounters to Durward who, in turn, issued Lawson multiple letters forbidding her return to work until the conclusion of the investigation into the sexual harassment complaint. Durward's eventual evaluation report noted that Lawson suffered from a "stress reaction" stemming from "sexual harassment on the job." Around this time, Lawson also sought a no-contact order against Herbert from the Glasgow Police Department, citing Herbert's apparent anger over her accusations of sexual assault.

¶14 Lawson contacted the Montana Human Rights Bureau (HRB) and scheduled an appointment for November 2, 2017. Beginning on November 3, 2017, Lawson called out of work, attributing her absence to the "extreme stress and anxiety caused by your continued harassment and retaliation and threats." On November 10, 2017, Lawson received a letter from Herbert, dated November 6, notifying her that she was banned from NorVal's property, that her work email and credit card had been revoked, and that there would be a meeting to determine her continued employment. Lawson then received a letter

9

from Knierim, dated November 7, stating she would be terminated immediately if she pursued a no contact order.[3] On November 21, 2017, in response to a request from Lawson to extend her sick leave, Herbert sent a letter to Lawson stating her sick leave would soon expire, reaffirming that he was her sole means of communication with NorVal, and that "All of your previous complaints lodged with NorVal have been investigated."

¶15 Lawson formally filed a discrimination complaint with the HRB on November 24, 2017. Herbert withdrew the severance offer to Lawson. Herbert disputed Lawson's request for extended medical leave as insufficient because it was based on the medical notes of Durward, who Herbert stated was "not a physician." On January 2, 2018, Lawson received a payout of all her accrued vacation and sick leave, in accordance with company policy for employment termination. However, Herbert informed Lawson she was still listed as an employee, and would continue to be so until NorVal's attorneys decided otherwise or Lawson accepted employment elsewhere. Lawson made several efforts to communicate with Herbert and the Board to obtain the results of the asserted investigation into her complaints, but received no response. On February 5, 2018, Herbert sent a letter to Lawson informing her that Norval had filed its Answer with HRB regarding her complaint. According to NorVal, Lawson had falsely alleged sexual harassment to cover up "serious deficiencies in [her] job performance," including a backlog that had developed in her work. Around this time, Herbert told other NorVal employees that Lawson was

---

[3] Knierim testified he was yet unaware of Lawson's sexual harassment complaint when he drafted this letter.

being investigated for possible fraud. No evidence to support such a claim was produced, and neither of the two accountants hired to fill in for Lawson were asked to investigate such a claim.

¶16 On February 27, 2018, Lawson amended her HRB complaint to include a claim of retaliation. In April 2018, NorVal's counsel asked Lawson to provide a statement from a "qualified physician" verifying Lawson was unable to perform her duties. Lawson conferred with Dr. Chris Laviola, Ph.D., (Laviola), who recommended Lawson remain off work due to her depression and suicidal ideations related to her sexual harassment complaint. Lawson provided this information to NorVal but received no response. Durward also treated Lawson through 2019. During that time, Durward observed a significant reduction in Lawson's well-being and her connection to the Glasgow community. As of the time of her suspension, Lawson's annual salary was $84,567, with benefits valued at $1,184.91, monthly.

¶17 In May 2018, the HRB issued an initial investigative report on Lawson's complaint concluding no harassment or retaliation had occurred. Lawson filed an objection with the Human Rights Commission (HRC), which, after briefing and a hearing, concluded the HRB's initial report was erroneously based upon incomplete information or misapprehension of the law, and remanded the case for a hearing. After extensive discovery, a contested case hearing was held, and a Hearing Officer Decision (HOD) was issued in October 2019. The Hearing Officer concluded Lawson had been subjected to sexual harassment and retaliation and, after detailed wage calculations, awarded her

11

$192,384.89 in back pay, $13,635.51 in interest on lost wages, $50,000 for emotional distress damages, and attorney fees. Finding reinstatement was not feasible under the factors to be considered, the Hearing Officer found Lawson was entitled to front pay. Citing *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991), for the principle that, "[b]ecause of the potential for windfall, [front pay's] use must be tempered," the Hearing Officer noted that the Department "has historically followed the guidance of the [Montana] Wrongful Discharge from Employment Act, which allows for recovery of lost wages for a maximum of four years from the date of discharge." Thus, the Hearing Officer awarded $415,786.06, reasoning:

> Lawson worked for NorVal for seven years prior to her going on medical leave. Awarding four years of front pay [is] not unreasonable given the years of service and the slim probability of Lawson finding work that offered the same or similar wages and benefits she was enjoying at NorVal when she went on her medical leave of absence. Further, such an award would not be unduly speculative or not supported by the record. Such an award would not result in [] Lawson enjoying an unjust windfall.

¶18 Both parties appealed to the HRC. NorVal challenged the Hearing Officer's finding of discrimination, and Lawson argued the Hearing Officer erred by citing the WDEA, because that Act is not applicable to claims under the Human Rights Act. The HRC affirmed the finding of discrimination, and reasoned as follows regarding Lawson's challenge to the calculation of front pay:

> The WDEA is not controlling of damages awards under the MHRA; however, the Hearing Officer specifically stated that "OAH has historically followed the *guidance* of the Wrongful Discharge from Employment Act," HOD, pp. 50-51 (emphasis added). The Commission concludes that neither the Hearing Officer's use of the WDEA as guidance for calculation of

12

> Lawson's front pay damages award *nor the amount of the award were clearly erroneous.*

(Emphasis added.) The HRC's Final Agency Decision slightly altered the Hearing Officer's damage calculations, resulting in a small increase in the overall award: $189,094.30 in backpay, $13,402.30 in interest on lost wages, $50,000 in emotional distress damages, and $505,957.92 in front pay, for a total of $758,454.52, plus attorney fees.

¶19 Both parties petitioned for judicial review of the Final Agency Decision. The District Court upheld the Agency's finding of discrimination but concluded the Agency's use of a four-year cap for front pay damages was arbitrary and capricious, reasoning that while the Agency had "concluded that capping damages at four years 'would not result in [an] unjust windfall,' it did not find that applying the four-year damage cap was necessary to avoid an unjust windfall." Utilizing Lawson's expert witness's calculation of damages, which it described as "a conservative calculation," the District Court increased Lawson's front-pay damage award from $505,957.92 to $1,379,338, for total damages of $1,631,834.60, plus attorney fees.

¶20 Regarding calculation of attorney fees, the District Court issued an Order on Motion for Fees and Costs (Fees Order), in which the District Court conducted a "lodestar" analysis and awarded Lawson $519,837 in attorney fees, and $48,258.88 in costs. The District Court declined to apply a multiplier to its award of fees to Lawson, reasoning that it has already considered the contingency risk undertaken by Lawson's attorney within its

13

lodestar analysis, and that the circumstances of Lawson's attorney's representation did not necessitate application of a fee multiplier.

¶21   NorVal appeals.  Lawson cross-appeals the District Court's attorney fee calculation.

## STANDARDS OF REVIEW

¶22   When reviewing a district court's affirmation or reversal of an agency decision, we apply the same standard of review as the district court.  *Arlington v. Miller's Trucking, Inc.*, 2012 MT 89, ¶ 17, 364 Mont. 534, 277 P.3d 1198.  District courts are bound by the Montana Administrative Procedure Act (MAPA) when reviewing agency decisions. Section 2-4-704, MCA; *Mont. State University-Northern v. Bachmeier*, 2021 MT 26, ¶ 24, 403 Mont. 126, 480 P.3d 233 (hereinafter *MSU-N.*).  Under MAPA, a court may not "substitute its judgment for that of the agency" on questions of fact; it may, however, reverse of modify administrative findings if substantial rights of the appellant have been prejudiced because the administrative findings are: i) in violation of constitutional of statutory provisions, ii) in excess of statutory authority, iii) made upon unlawful procedure, iv) affected by other error of law, v) clearly erroneous in view of the whole record, or vi) arbitrary or capricious or an abuse of discretion.  Section 2-4-704(2)(a), MCA.  As such, courts are limited to "review[ing] the entire record to determine whether the agency's findings of fact are clearly erroneous and whether its determinations of law are correct." *MSU-N.*, ¶ 25.  A hearing officer's findings, especially regarding witness credibility, are entitled to "great deference."  *MSU-N.*, ¶ 25 (quoting *KB Enters., LLC v. Mont. Human Rights Comm'n.*, 2019 MT 131, ¶ 9, 396 Mont. 134, 443 P.3d 498).

14

## DISCUSSION

¶23   *1.  Did the District Court err by upholding the HRC's determination that Lawson was subjected to severe and/or pervasive sexual harassment by NorVal, and that NorVal retaliated against Lawson?*

¶24   NorVal argues the incidents between Herbert and Lawson, and NorVal's responses to those incidents, do not rise to the level of "severe and/or pervasive" harassment necessary to constitute sexual discrimination as defined in the Montana Human Rights Act (MHRA or Act).  NorVal contends the context of Herbert's actions was not adequately considered, and therefore the District Court erred by affirming the Hearing Officer's determination that Lawson was subjected to sexual discrimination.  NorVal also contends Lawson was not retaliated against, because she was not subjected to any of the adverse employment conditions provided in A.R.M. 24.9.603(2), and, alternatively, even if she was subjected to adverse impacts, they were the consequence of Lawson's own work-related deficiencies, not her sexual harassment claims.

¶25   Lawson, emphasizing the review standards to be applied, argues the District Court properly deferred to the Hearing Officer's factual findings, and points to the totality of the circumstances as proving she was subjected to a hostile work environment.  Regarding retaliation, Lawson argues the District Court correctly upheld the Agency's determination because, even though some of NorVal's actions were not found to be retaliatory,[4] there

---

[4] The Hearing Officer found that several of NorVal's actions, such as its "conduct before the Human Rights Commission," "failure to file Lawson's workers' compensation claims according to [Lawson's] specifications," and "Herbert's email telling [Lawson] that she would be terminated if she were to work for another employer," while "clearly petty and malicious," did not "constitute adverse employment actions."

15

were nonetheless other actions, such as Herbert's October 10th reprimand letter, which clearly constituted retaliation. Lawson also argues that proving retaliation is a lesser burden than proving discrimination, and does not require proof of a harassment claim as a prerequisite.

## A. Discrimination

¶26 Employers are prohibited from discriminating against an employee on the basis of sex in regard to employment conditions or compensation. Section 49-2-303(1), MCA; 42 U.S.C. § 2000e-2. Sexual discrimination encompasses sexual harassment. *Stringer-Altmaier v. Haffner*, 2006 MT 129, ¶ 18, 332 Mont. 293, 138 P.3d 419. Sexual harassment is defined to include both quid pro quo harassment, in which employment benefits are conditioned on sexual favors, and hostile work environment harassment. *MSU-N.*, ¶ 28 (citing *Beaver v. Mont. Dep't. of Natural Res. & Conservation*, 2003 MT 287, ¶ 29, 318 Mont. 35, 78 P.3d 857). A work environment is hostile if the employee is subjected to unwelcome verbal or physical conduct of a sexual nature that is "sufficiently severe or pervasive to alter the condition of her employment and create an abusive working environment." *Stringer-Altmaier*, ¶ 22 (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64-65, 106 S. Ct. 2399, 2404-05 (1986)).[5] The severity and pervasiveness of the harassment is sufficient if it is both "objectively and subjectively offensive"; meaning that "a reasonable person would find [the workplace] hostile and abusive, and [the victim] in

---

[5] Because the MHRA was closely modeled after Title VII, "reference to federal case law is both appropriate and helpful." *Stringer-Altmaier*, ¶ 17.

16

fact perceived [it] as hostile and abusive." *Beaver*, ¶ 31; *Campbell v. Garden City Plumbing & Heating, Inc.*, 2004 MT 231, ¶ 19, 322 Mont. 434, 97 P.3d 546.

¶27 "[T]he correct legal standard to be applied to determine whether an environment is 'hostile' or 'abusive' is to view the totality of the circumstances," *Beaver*, ¶ 42, which may include: the frequency and severity of the misconduct, the extent to which it unreasonably interfered with the victim's work performance, whether the misconduct was physically threatening or humiliating versus merely offensive, whether the misconduct occurred within the victim's typical workspace, the availability of appropriate reporting mechanisms, the extent of the employer's investigation into the misconduct, the adequacy of the employer's remedial measures, whether the victim was required to continue interacting with the harasser, and whether the employer protected the victim and disciplined the harasser or instead retaliated against the victim. *Beaver*, ¶¶ 31, 37-38, 48-49 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283 (1998)); *Benjamin v. Anderson*, 2005 MT 123, ¶¶ 52-54, 327 Mont. 173, 112 P.3d 1039; *Stringer-Altmaier*, ¶¶ 27-29. The victim's psychological well-being is also a factor in the consideration of the workplace's offensiveness. *Beaver*, ¶ 42 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367 (1993)).

¶28 Here, the Hearing Officer's findings are supported by substantial evidence that Herbert subjected Lawson to unwelcome verbal and/or physical conduct of a sexual nature in her work environment. We thus consider whether the conduct was sufficiently severe or pervasive to alter the condition of Lawson's employment and create an abusive working

17

environment, both subjectively from the victim's perception, and objectively from the perspective of a reasonable person. *Beaver*, ¶ 31.

¶29 Lawson took offense to Herbert's actions, reported them as best she could, and yet, NorVal took no positive steps to address or remedy the situation. Subjectively, Lawson clearly perceived Herbert's misconduct as offensive. She became visibly upset on several occasions. She resisted Herbert's suggestions at the time they occurred and, to "ward off" additional actions by Herbert, changed how she presented herself at work by her dress and hygiene practice. She ultimately confronted Herbert. Lawson was affected sufficiently by Herbert's ongoing behaviors, and eventually, NorVal's lack of response, that she consulted medical professionals who diagnosed her with depression and suicidal ideation related to the ongoing stresses of her work environment. NorVal does not dispute that Lawson subjectively perceived NorVal's workplace as hostile and abusive.

¶30 Objectively, in consideration of the totality of the circumstances, including insinuations the employee wanted to commence a sexual affair by wearing false eyelashes, offers to give a massage, sniffing of hair, attempting to hug or make physical contact, making inquiry about the employee's sex life and comments about "turn offs," comments about filling out pants, and set-ups to visit a hotel room while away on a work trip, we have little difficulty in affirming the Hearing Officer's conclusion that a reasonable person subjected to such actions would find NorVal's workplace to be hostile and abusive. Herbert's behavior does not constitute "mere intersexual flirtation," as NorVal describes it.

18

¶31 The hostility of Lawson's workplace was underscored by NorVal's response to her attempted complaints. *See Beaver*, ¶ 38 (the totality of the circumstances includes consideration of "remedial measures by the employer or institution."). Norval failed to provide a known process for an employee to make a complaint, particularly in the event the general manager was the alleged harasser, and instead was oppositional to Lawson's concerns, leaving her allegations in Herbert's hands and control. In *Benjamin*, despite the discrimination claim stemming from a single assault outside of work, the Court concluded the totality of the circumstances demonstrated a hostile or abusive work environment where the employer had failed to respond to the employee's complaint. The Court stated, quoting the District Court:

> the culpable acts of continuing discrimination in the workplace primarily took the form of the employer's failure to seriously and adequately investigate and discipline [the offender] following the assault and the employer's subsequent failure to protect [the victim] on the job. . . . [which] continued to let [the offender] supervise [the victim] on the job and began collecting and even creating evidence against [the victim] in an attempt to justify firing [the victim] for poor work habits.

*Benjamin*, ¶ 54. The *Benjamin* Court distinguished *Beaver*, wherein the victim's workplace was found to be non-hostile largely because the employer acted effectively to protect the victim and eliminate the possibility of future contact between the offender and the victim. *Beaver*, ¶¶ 49-50. While it may not be possible in a small office to completely eliminate contact between a complaining employee and the alleged harasser, here NorVal failed to both shield Lawson from Herbert's continuing contact and behaviors as she attempted to

19

navigate the complaint process, and to authorize a third party to investigate her complaints against him.

¶32 Considering the totality of the circumstances here, we conclude the District Court did not err in affirming the Hearing Officer's determination that Lawson was exposed to a hostile and abusive work environment at NorVal, and was subjected to sexual harassment.

## B. Retaliation

¶33 The MHRA and Title VII prohibit employer retaliation against an employee engaging in a protected activity. Section 49-2-301, MCA; 42 U.S.C. § 2000e-3(a). A plaintiff must establish a prima facie case of retaliation by showing: 1) "that she engaged in a *protected activity*"; 2) "that she was thereafter subjected to *adverse employment action* by her employer"; and 3) "that there was a *causal link* between" the protected activity and the employer's action. *Beaver*, ¶ 71 (emphasis added); *see also Rolison v. Bozeman Deaconess Health Servs.*, 2005 MT 95, ¶ 17, 326 Mont. 491, 111 P.3d 202; A.R.M. 24.9.603(1) ("A significant adverse act against a person because the person has engaged in protected activity . . . is illegal retaliation."). A plaintiff must prove her claim by a preponderance of the evidence though direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100, 123 S. Ct. 2148 (2003); *MSU-N.*, ¶ 61. "Once the employee meets that initial burden, the employer must articulate non-discriminatory reasons for the adverse action; the burden then 'shifts back to the employee to demonstrate the articulated reasons are a pretext for retaliation.'" *MSU-N.*, ¶ 53 (citing *Bollinger v. Billings Clinic*, 2019 MT 42, ¶ 29, 394 Mont. 338, 434 P.3d 885).

¶34 The first element, engaging in a "protected activity," as defined by the Administrative Rules of Montana, "means the exercise of rights under the [MHRA] or [Title VII] and may include . . . (b) opposing any act or practice made unlawful by the act or code; [or] (c) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing to enforce any provision of the act or code." A.R.M. 24.9.603(1); *see also* § 49-2-301, MCA (unlawful discrimination includes retaliating "against an individual because the individual has opposed any practices forbidden under this chapter or because the individual has filed a complaint, testified, assisted, or participated in any manner in an investigation or proceeding under this chapter."); *MSU-N.*, ¶ 52.

¶35 Secondly, an "adverse employment action" encompasses an employer action that is "materially adverse" to the employee. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 68, 126 S. Ct. 2405, 2409, 2415 (2006) (*BNSF).* "We speak of *material adversity* because we believe it is important to separate significant from trivial harms." *BSNF*, 548 U.S. at 68, 126 S. Ct. at 2415 (emphasis in original). A "significant adverse act" must "adversely affect [the] employment in a[] material way." *Borges v. Missoula Cty. Sheriff's Office*, 2018 MT 14, ¶ 27, 390 Mont. 161, 415 P.3d 976 (internal quotation omitted). A.R.M. 24.9.603(2) provides: "[s]ignificant adverse acts are those that would dissuade a reasonable person from engaging in a protected activity," which may include "discharge, demotion, denial of promotion, denial of other benefits *or other material adverse employment action*." (emphasis added); *see also BNSF*, 548 U.S. at 68, 126 S. Ct.

at 2415 ("a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (internal quotation and citations omitted)). "Normally petty slights, minor annoyances, and simple lack of good manners will not create such a deterrence." *BNSF*, 548 U.S. at 68, 126 S. Ct. at 2415. However, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *BNSF*, 548 U.S. at 69, 126 S. Ct. at 2415. The real impact of an employer's actions, therefore, "often depends on a constellation of surrounding circumstances, expectations, and relationships. . . ." *BNSF*, 548 U.S. at 69, 126 S. Ct. at 2415 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82, 118 S. Ct. 998, 1003 (1998)). A reprimand alone can be "sufficient to support a retaliation claim," depending on the particular circumstances. *MSU-N.*, ¶ 62.

¶36 Third, regarding a causal link between the protected activity and the employer's material action, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2002); *see also Howard v. City of Coos Bay*, 871 F.3d 1032, 1046 (9th Cir. 2017). However, the sequence and timing of the protected activity and the employer's material action can give rise to a disputable presumption that there is a causal link between them:

> When a respondent or agent of a respondent has actual or constructive knowledge that proceedings are or have been pending with the department, with the commission or in court to enforce a provision of the act or code, significant adverse action taken by respondent or the agent of respondent

22

against a charging party or complainant while the proceedings were pending or within six months following the final resolution of the proceedings will create a disputable presumption that the adverse action was in retaliation for protected activity.

A.R.M. 24.9.603(3). Under federal law, "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 869 (9th Cir. 2014).

¶37 NorVal contests the Hearing Officer's determination that Lawson was subjected to retaliation by arguing that none of the "constellation" of occurrences presented by Lawson fell within the explicit adverse employment actions listed in A.R.M. 24.9.603(2), and, even if they came within the general language of the Rule, they did not constitute material adverse actions. First, Lawson was clearly engaged in protected activity, which NorVal does not contest. On October 6, 2017, Lawson verbally complained about the hotel incident when she, in keeping with NorVal's reporting policy, met with Herbert about the incident and informed him she was documenting his actions. On October 9, Lawson again met with Herbert and requested direction on how to properly register her complaints. Thereafter, her repeated requests about the processing of her complaint and the status of any investigation were clearly efforts "supporting a charge of discrimination." *BNSF*, 548 U.S. at 68, 126 S. Ct. at 2415. These actions culminated in Lawson's filing of a complaint with the HRB in November of 2017. All of these were "protected activities."

23

¶38 NorVal, through Herbert, took adverse actions against Lawson's employment almost immediately after she made her initial complaint. On October 10, 2017, following Lawson's conferences with Herbert on October 6 and 9 about the hotel incident, she received a letter from NorVal's counsel, instigated by Herbert, notifying her that Herbert had reprimanded her for employee behavior, and threatening "immediate[]" termination of her employment if she did not reform her behavior. The letter made no mention of her complaint against Herbert, but accused her of creating a toxic work environment and challenging Herbert's authority. Lawson testified that Herbert then began treating her in a degrading and belittling manner. This behavior does not constitute a material adverse action by itself, but it is part of the "surrounding circumstances, expectations, and relationships," *BNSF*, 548 U.S. at 69, 126 S. Ct. at 2415, that provide context for what Lawson experienced in her employment. More concretely, Herbert required that Lawson notify him whenever she left the office and removed her from her role as the minute-taker for Board meetings, essentially a duty reassignment. He later banned her from the premises when Lawson began taking sick leave. The Hearing Officer concluded that these actions, which were conveyed to other employees and the Board, along with Herbert's other statements about Lawson, communicated to the organization his lack of confidence in her, and materially adversely impacted her employment with NorVal.

¶39 Herbert obstructed Lawson from pursuing a complaint against him and essentially blocked her from seeking the recourse that should have been available to her under NorVal's employment policy, a clear attempt to "dissuade a reasonable person from

24

engaging in a protected activity." A.R.M. 24.9.603(2). The Hearing Officer found that "Herbert's obstruction basically made it impossible for Lawson to be able to continue in her employment with NorVal, thereby having a material and adverse impact" on her employment there. After Lawson filed a complaint with the HRB, Herbert withdrew the outstanding severance offer for Lawson and disputed the validity of her medical diagnosis.

¶40     NorVal's actions, through Herbert, commenced within a period of days after Lawson engaged in protected activity, starting with the reprimand letter. NorVal has not proffered any legitimate reason for its behavior—it made no effort to investigate Lawson's alleged work deficiencies, nor did it dispel the temporal connection between its actions and Lawson's protected activity. Consequently, a presumption of retaliatory intent arose as a matter of law. A.R.M. 24.9.603(3).

¶41     While not all the actions taken against Lawson constituted material adverse actions, collectively there can be no doubt. Further, there was likewise substantial evidence to support the Hearing Officer's determination that NorVal took the adverse actions in retaliation for Lawson engaging in protected activities, and not for a non-discriminatory purpose such as those offered by NorVal that were merely pretext for the retaliation. We conclude the District Court did not err in affirming the Final Agency Decision that Lawson was subject to retaliation.

¶42     *2. Did the District Court err by increasing the "front pay" damages awarded by the HRC?*

¶43     NorVal contends the District Court's increase of Lawson's front-pay damage award from $505,957.92 to $1,379,338, was error. It argues the District Court misconstrued the

HRC's reasoning for calculating the award and thereby improperly concluded that the HRC's reference to the WDEA's four-year damage cap was arbitrary and capricious.

¶44 The District Court reasoned that, despite the Hearing Officer's and HRC's recognition that the WDEA was not controlling authority, neither had pointed to findings or conclusions that supported application of the WDEA. The District Court further reasoned that capping the front-pay award was contrary to the Hearing Officer's findings that it would be impossible for Lawson to return to work for NorVal and that it was unlikely Lawson would be able to find substantially similar work, despite acknowledging that the purpose of these findings was, in part, to justify an award of front-pay damages. While noting the Hearing Officer had concluded a four-year front-pay award "*would not result* in an unjust windfall," the District Court nonetheless faulted the Hearing Officer for failing to find a four-year limitation "*was necessary to avoid* an unjust windfall."

¶45 Damages are a factual determination for which a court may not substitute its judgment for the agency's, and may reverse on only narrow grounds, including that the agency's decision is arbitrary and capricious, which the District Court determined here. Section 2-4-704(2)(a), MCA; *MSU-N.*, ¶ 25. First, it is clear that neither the Hearing Officer nor the HRC applied the WDEA as binding authority. The HRC acknowledged that "[t]he WDEA is not controlling of damage awards under the MHRA," and explained the Hearing Officer had used the WDEA only for guidance. More significantly, the District Court's reasoning that the agency's reference to the WDEA for a four-year award was not supported by the findings, and was thus arbitrary and capricious, overlooks that the HRC

26

alternatively determined, based upon its review of the record, that the Hearing Officer's four-year award was not clearly erroneous, but rather a correct determination of front pay damages in the case. The Hearing Officer premised the four-year front pay award on Lawson's seven years of employment service, her likely future difficulties with finding similar work, and that this amount would not be unduly speculative, unsupported by the record, or result in an unjust windfall. The WDEA was no more than a reference point for an award that was otherwise justified by the record. Whether or not the record may also support a higher award, as Lawson advocates, is not the standard. *See Mont. Wildlife Fed'n v. Mont. Bd. of Oil & Gas Cons.*, 2012 MT 128, ¶ 25, 365 Mont. 232, 280 P.3d 877 ("A review under the arbitrary and capricious standard 'does not permit a reversal merely because the record contains inconsistent evidence or evidence which might support a different result. Rather, the decision being challenged must appear to be random, unreasonable or seemingly unmotivated based on the existing record.'") (citation omitted). Under these circumstances, we are hard pressed to conclude the award was arbitrary and capricious.

¶46 Therefore, we conclude the District Court erred in reversing the HRC's front-pay damage award, and reinstate the HRC's determination of front-pay damages.

¶47 *3. Did the District Court abuse its discretion in its determination of Lawson's attorney fee award?*

¶48 Lawson retained Todd Shea (Shea) to litigate her claims against NorVal. The record indicates Shea has practiced law for more than thirty years and attained a good reputation. Shea initially agreed to charge Lawson $250 per hour for his services, along with $110 per

27

hour for paralegal services, but switched the representation arrangement to a contingency basis when it became clear Lawson would not be able to maintain his fees during the litigation. From 2017 to 2022, Shea participated in the investigative process before the HRB, the appeals to the HRC leading to a contested case hearing, a favorable decision from the Hearing Officer, favorable proceedings before the HRC and the District Court, and has handled the appellate proceedings before this Court.

¶49    In the District Court, Shea sought compensation at an increased hourly rate of $325, and offered expert testimony that this rate was reasonable given his skills and experience. The District Court took guidance from the two-step "lodestar/multiplier test" established in *Kerr v. Screen Extras Guild, Inc*., 526 F.2d 67 (9th Cir. 1975), under which a calculation of the lodestar amount is made, followed by an assessment of whether a multiplier is necessary to achieve a reasonable award. The District Court calculated the number of hours reasonably expended, considered Shea's skill and performance, the quality of his performance, and the result he obtained, and assessed the difficulty of the case. Based on the *Kerr* framework and the expert testimony, the District Court concluded Shea's proposed hourly rate of $325 was reasonable and his requested hours were reasonable, and awarded $519,837 in fees and $48,258.44 in costs. The District Court reasoned that the fee award should not be further enhanced by a "multiplier" because it had considered factors that may support application of a multiplier, such as such as the quality of the result, the extent of delay, and the economic undesirability of representing the particular class of claims, within its initial lodestar analysis. Specifically, the District Court reasoned that the

28

increase to $325 an hour reflected "the contingency risk that Shea undertook to represent his client as well as [the] resulting four-year delay in payment for his services," and "the excellent results obtained and delays in payment."

¶50     Lawson cross-appeals the District Court's decision not to apply a multiplier to the fee award. Lawson argues it was inconsistent for the District Court to find Shea had charged a reasonable hourly rate of $325, while also finding the $325 rate reflected the attendant risks and burdens of the litigation, because the $325 hourly rate is specifically reasonable only for "non-contingency cases." NorVal responds that the District Court's lodestar calculation was appropriate, and the fee award was not an abuse of discretion. It notes the U.S. Supreme Court and this Court have held that a lodestar calculation cannot be enhanced merely based upon the risk of contingency representation. *See Ihler v. Chisholm*, 2000 MT 37, ¶ 72, 298 Mont. 254, 995 P.2d 439 (citing *City of Burlington v. Dague*, 505 U.S. 557, 112 S. Ct. 2638 (1992)) ("*Dague* prohibits an enhancement based on contingent risks").

¶51     Under the MHRA, a court "in its discretion may allow the prevailing party reasonable attorney fees and costs." Section 49-2-505(8), MCA. The reasonableness of the attorney fees awarded is determined by the facts of each case. *Plath v. Schonrock*, 2003 MT 21, ¶ 36, 314 Mont. 101, 64 P.3d 984. A plaintiff need not prevail on every claim to receive attorney fees and costs. *Laudert v. Richland County Sheriff's Dep't*, 2001 MT 287, ¶ 20, 307 Mont. 403, 38 P.3d 790. The awarding of fees is intended to "enable private parties to retain the legal assistance necessary to seek redress when their rights are

29

violated," and should not result in a windfall for counsel. *Laudert*, ¶ 17 (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S. Ct. 3088, 3098 (1986)). This Court reviews a district court's award of fees and costs for abuse of discretion. *Ihler*, ¶ 24. A court abuses its discretion when it "acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason, resulting in substantial injustice." *Gendron v. Mont. Univ. Sys.*, 2020 MT 82, ¶ 8, 399 Mont. 470, 461 P.3d 115.

¶52 If a court determines an award of attorney fees to be appropriate, the court then calculates the amount of the award. A "lodestar" amount is calculated by "multiplying the number of hours reasonably spent on the case by an appropriate hourly rate in the community for such work." *Gendron*, ¶ 12 (quoting *Tacke v. Energy West, Inc.*, 2010 MT 39, ¶ 32, 355 Mont. 243, 227 P.3d 601). These reasonableness determinations are based upon an initial list of factors:

(1) the amount and character of the services rendered;
(2) the labor, time and trouble involved;
(3) the character and importance of the litigation in which the services were rendered;
(4) the amount of money or the value of the property to be affected;
(5) the professional skill and experience called for;
(6) the attorneys' character and standing in their profession; and
(7) the results secured by the services of the attorneys.

*Gendron*, ¶ 13. "These factors are nonexclusive, and a district court may rely on other considerations in determining reasonableness." *Gendron*, ¶ 13. There is a "strong presumption that the lodestar figure represents a reasonable fee." *Ilher*, ¶ 72. While a case may justify a multiplier or enhancement, the claimant "has the burden of proving that the

30

requested enhancement is 'necessary to the determination of a reasonable fee.'" *Ilher*, ¶ 72 (citing *Dague*, 505 U.S. at 562, 112 S. Ct. at 2641). To avoid double consideration, a multiplier must be determined based upon further factors not already considered in the lodestar calculation, such as the extent of delay and the economic undesirability of representing the particular class of claims. *Audit Servs. v. Frontier-West*, 252 Mont. 142, 154, 827 P.2d 1242 (1992); *Ilher*, ¶¶ 33-40.

¶53   Lawson contends the District Court's analysis based upon the *Kerr* framework shortchanged consideration of factors such as the novelty and difficulty of the questions involved in the case, her attorney's preclusion from other employment, time limitations imposed by the circumstances, and awards in other cases. However, while the *Kerr* factors are not stated identically with the factors of the Montana test, *cp. Gendron*, ¶ 13, there is considerable overlap and most of the *Kerr* factors were at least touched upon in the District Court's lodestar analysis.[6] It stated it had considered additional factors in coming to its lodestar determination, which was its prerogative. *Gendron*, ¶ 13 ("a district court may rely on other considerations in determining reasonableness."). Further, the District Court had wide discretion in determining a reasonable fee award. *Gendron*, ¶¶ 11-15. Thus, while the *Kerr* framework is somewhat different than Montana's stated framework, and the District Court may not have considered all of the *Kerr* factors, the District Court had

---

[6] Notably, the District Court's assessment of reasonably expended hours indicated the case "should have been a simple routine sexual harassment case" were it not for the complications attributed to NorVal's conduct throughout the matter and the initial dismissal of Lawson's complaint by HRB.

considerable latitude in this regard, and the award is presumed to be reasonable. We are persuaded the court properly concluded the award was reasonable and that Lawson has not demonstrated that application of a multiplier or enhancement was necessary to achieve reasonableness.

¶54 Affirmed in part, reversed in part, and remanded for entry of an amended judgment consistent herewith.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR